Appellant was convicted of murder in the first degree and the jury fixed his punishment at life imprisonment in the penitentiary. Prior to trial appellant was found to be indigent and the Court appointed counsel to represent him at arraignment and trial. He pleaded not guilty and not guilty by reason of insanity. The Court directed that appellant be examined by a psychiatrist and a psychologist at the Mental Health Center in Florence, Alabama. The reports from these examinations reflected that appellant had an antisocial personality but was not suffering from any mental illness. Appellant's counsel withdrew the special plea of not guilty by reason of insanity. After sentence was imposed, appellant gave notice of appeal and was furnished a free transcript and trial counsel was appointed to represent him on appeal. *Page 1064 
Appellant had previously been convicted of several felonies and while serving time his father was killed and according to the tendencies of the State's evidence he had made up his mind to avenge the death of his father. He had been out of prison less than 30 days when he shot and killed Joe Wright with a twelve gauge automatic shotgun using number six shot. Wright died instantly.
The testimony of this case covers over 300 pages of the record. We do not deem it necessary to detail the testimony of each witness but we will recite so much of the testimony as is necessary to cover the issues raised by appellant in which he claims reversible errors were committed.
While in prison appellant heard rumors that James (Fish) Wright, a brother of the deceased, Joe Wright, was the person who killed his father. He also heard that J.V. Odum, Jr., and Mavis Balentine (his stepmother) had started dating after his father was killed. Appellant made the statement that he thought they were dating before his father was killed and that J.V. and Mavis had some part in his father's death. J.V. Odum was Joe Wright's brother-in-law. John Odum, Sr., and J.V. Odum, Jr. owned and operated the St. Joe Milling Company, and Jane Wright (Joe Wright's widow) worked at this feed mill on April 24, 1975, the day appellant shot and killed Joe Wright. Appellant also thought that Mitchell Simpson was in some manner involved in his father's death.
C.W. Lawson testified that he was a resident of St. Joseph, Tennessee, and that between 3:00 and 4:00 p.m. on April 24, 1975, he and his brother saw Randy Wilson and appellant in St. Joe. Lawson saw that appellant had a shotgun. Appellant asked Lawson to take him to the J.V. Odum Mill. Lawson asked him why he wanted to go there and appellant, over counsel's objections, replied that he planned to kill J.V. Odum and Mavis Balentine. Lawson refused to carry appellant to the mill.
The testimony for the State tended to show that appellant and one or more companions spent most of the day the shooting occurred going from one beer joint to another and appellant consumed at least a case of beer and probably a good deal more. It was also shown that the deceased and Mitchell Simpson were together on the afternoon of April 24, 1975, and they were drinking heavily.
Mitchell Simpson testified that he had known appellant for about five years. On April 24, 1975, Simpson saw the deceased at Buck's Tavern at 12:00 noon. He and the. deceased visited a sick friend and then they went to Parker's beer joint and had one beer each. They returned to Buck's Tavern and found that Simpson's car was gone. The deceased told Simpson he would carry him home and they left going toward the Cowpen Road. They met appellant in Simpson's car and Simpson told the deceased to stop and he would ride home with appellant. Appellant came out of the car with a shotgun and accused Simpson of aiding in the killing of his father and he ordered him to get in the car saying, "I am not going to kill you right now," or words to that effect. Simpson further testified that when he was getting out of the deceased's car the only thing he heard the deceased say was that he would like to speak to appellant as he had not seen him in a long time. He stated the deceased was not mad about anything and did not have a weapon of any kind. Simpson said as he was returning to get in the car as ordered by appellant he saw appellant fire the shotgun in the air one time and then appellant fired three more shots. Appellant then ordered Simpson to accompany him and that he was going to St. Joseph to find Mavis Balentine at the feed mill. They went to the feed mill but it was closed. They saw the wife of the deceased and appellant said, "There's one of them people that works at that feed mill now," and reached down as though he were going to lay his hand on the gun. Simpson stopped him and told him, "That's Joe's wife. Don't bother her. That's a good woman." The deceased's wife came up to the car and asked where her husband was. Appellant replied that he did not know. *Page 1065 
Appellant and Simpson proceeded to C.W. Lawson's home but he was not at home. Appellant told Lawson's wife that he needed some shells and he gave her some money to buy the shells and a six pack of beer. Appellant put the gun down and Simpson grabbed it and pointed the gun at appellant and appellant asked him not to shoot and threw up his hands. Simpson told Lena Mae Lawson to "go get the law," and she got in the car and started up the road. Simpson stated that after Lena Mae left appellant took all of his clothes off except his shorts and told Simpson to shoot him saying, "I want to die." After appellant stripped his clothes off, Simpson knew he didn't have a pistol so he decided this was a good time to get away from appellant. He then went over a fence and through the woods to a service station. Appellant started after him in Simpson's car but got the car hung in the fence. When Simpson got to the service station, one of the attendants examined the shotgun and told him it was jammed by a shell and he removed the shell and gave it to Simpson. Harold Purser, Simpson's son-in-law, drove up and they rode by to the scene of the shooting. Simpson was arrested when he got back to the place where the killing occurred and the officer got the shotgun out of the pickup truck. When Simpson was placed in jail, he still had the shotgun shell that had jammed the gun and it was left with the officers.
Simpson further testified that after appellant hung the car in the fence he backed up and headed north at a high rate of speed.
Lena Mae Lawson testified that around 5:30 p.m. on April 24, 1975, she saw appellant and Simpson at her house. Appellant told her that he had killed one S.O.B. that was involved in the killing of his father, and that Simpson was also involved and he was going to kill him. Appellant asked Mrs. Lawson for some shotgun shells and gave her a twenty-dollar bill. She then saw Simpson seize the shotgun and go over a fence into the woods. Mrs. Lawson gave the twenty-dollar bill to Jerry Rooker, Chief of Police of St. Joseph, Tennessee. At trial Chief Rooker identified the bill and it was admitted into evidence.
Lanny Jackson, Deputy Sheriff of Lauderdale County, got a call from Rick Thompson, an investigator for the District Attorney, to be on the alert for a '64 white Oldsmobile with Tennessee license plates. Jackson saw the car just south of Shoals Creek bridge on County Road 47 and this car was coming in his lane of traffic and ran him off the road. He judged the speed of the Oldsmobile to be between 80 and 90 miles per hour. Jackson turned around and gave chase with his blue lights on and also his siren. He radioed for a backup. The driver of the Oldsmobile drove off the road, abandoned the car and ran into the woods.
Joel Williams, a police officer with the Florence Police Department, got the call for help and he responded with his partner, Mrs. Elizabeth Hawk. Williams saw the suspect running in the woods and ordered him to stop but he kept running. Williams shot at him one time and he fell. He shouted that he was shot. Officer Hawk radioed for an ambulance and went to the suspect who turned out to be appellant. She put appellant's head in her lap but she did not ask him any questions. Appellant asked her if she knew James Balentine and she said no. She told appellant to be quiet and lie still. Appellant said, "I want you to understand I killed the man that killed my father."
Appellant was carried to a local hospital for emergency treatment for superficial wounds. At 8:00 p.m., the night of April 24, 1975, Lawrence Smelley, a criminal investigator with the Alabama Bureau of Investigation, took an oral statement from appellant in the hospital emergency room. Before asking appellant any questions he gave him the Miranda rights by reading them to him from a card. Officer Smelley stated that appellant did not appear to be intoxicated at all when he took his statement and that he did not appear to be under the influence of any drugs at the time.
Testimony was taken out of the presence and hearing of the jury to determine if *Page 1066 
appellant was given any medication that might render his statement involuntary and inadmissible into evidence.
Martha Kennedy, an LPN, was on duty in the Eliza Coffee Memorial Hospital Emergency Room when appellant was brought in. She testified that appellant had gunshot wounds on his legs and buttocks and he was given 1000 cc Ringers Lactate which was I.V. fluids. He was also given a tetanus toxoid, which is a lockjaw shot. He was given E-Mycin tablets which is an antibiotic. She expressed the opinion that none of these medications would affect a person's mind. She stated that the hospital chart did not show that appellant was given any shots for pain. She said if any pain shots had been given, they would have been recorded on the chart.
Dr. Quintus Langstaff, a medical doctor, testified that none of the medicines given to appellant would have any effect upon a person's ability to reason and communicate. He also testified that if appellant was under the influence of alcohol, his mental faculties would still not be impaired.
The jury was called back to the jury box and both Mrs. Kennedy and Dr. Langstaff gave the same testimony before the jury. Dr. Langstaff looked at appellant's medical records and testified that the notations on the record would indicate that these were superficial wounds and from examining the record, it was his judgment that appellant was not in shock.
Officer Smelley was recalled and testified as to his expertise in determining whether or not a person is intoxicated . . After talking with appellant he determined that he was not intoxicated. He gave appellant the Miranda rights and warnings by reading them to him from a card. He asked appellant if he understood his rights and he said that he did.
From the record:
 "Q. All right, sir, and would you tell the Ladies and Gentlemen of the Jury and the defense what type training you have been through other than just your everyday experience with people who are intoxicated?
 "A. Well, that would be it. I have been with the State Troopers for a period of thirteen years, ten of those years were on the road as an arresting officer and during that time I arrested numerous people and charged them with violation of driving while intoxicated.
 "Q. All right, sir, and have you been associated with and talked with and dealt with people who have been given sobriety tests?
"A. Yes, sir.
 "Q. All right, sir, and are you basing your opinion upon your viewing of these individuals who have had the sobriety tests in your presence and their actions?
"A. Yes, sir.
 "Q. All right, sir, and from your experience of ten years or more of dealing with these people, do you have an opinion as to whether or not Mr. Balentine was intoxicated at the time that you talked with him?
"A. Yes, sir.
"Q. What is that opinion?
 "A. At the time I talked with Mr. Balentine, it is my opinion that he was not intoxicated.
 "Q. All right, sir, and did he make a statement to you?
"A. Yes, sir, he did.
 "Q. Tell the Ladies and Gentlemen just what Mr. Balentine said to you.
 "MR. SLUSHER: AGAIN, YOUR HONOR, WE WILL RENEW OUR OBJECTION TO THE ADMITTANCE INTO EVIDENCE OF THIS STATEMENT ON THE GROUNDS THAT IT WAS NOT VOLUNTARILY GIVEN AND THAT MR. BALENTINE DID NOT FULLY UNDERSTAND THE MIRANDA WARNING AS GIVEN TO HIM BY — IF, IN FACT, IT WAS GIVEN TO HIM BY OFFICER SMELLEY.
"THE COURT: WE OVERRULE THE OBJECTION.
 "Q. After you read the Miranda Rights to him and ask him if he wanted to talk to you, what did he say to you? *Page 1067 
 "A. Well, I didn't ask him if he wanted to talk to me. He first called me over to the table that he was lying on and he said he wanted to ask me something and at that time I read him his rights. I said, `Charlie, before you say anything to me' or `Mr. Balentine, before you say anything to me, let me read you your rights.' And I read him his rights as I have explained and he said he understood all that, knew all about that, and then he said, `Is that fellow dead up there?' And I said, `Charlie, I don't know; now, they tell me he's dead, but I haven't seen him.' And he was quiet — paused for a moment, and then he said something to the effect, he said, `Who was he?' And I said, `Well, I can't give you a real good answer on that, Charlie, because I don't really know. Now, I've been told it was a man by the name of Joe Wright.' And he paused again, and he said, `I killed the wrong man.' And I said, `What do you mean by that, Charlie?' And he said, `Hell, I've killed the wrong man and now I've got to do it all over again.' And at this time I suggested to Mr. Balentine that he might should wait until he had the benefit of a lawyer before he said anything else to me.
"MR. JOHNSON: You may ask him.
"CROSS EXAMINATION BY MR. SLUSHER:
 "Q. Officer Smelley, when you began reading the rights to Mr. Balentine here and he stated to you that he knew all about those rights, did you then discontinue reading him his rights, or did you continue on and read him the full Miranda Warning?
 "A. I had already completed reading him his rights and asked him if he understood those rights and he said, `Yeah, I know all about them, I understand them.'"
Mr. John Kilbourn, Assistant State Toxicologist stationed at Florence, Alabama, was called to the scene of the shooting where he viewed the body and took photographs of the body and the scene. While at the scene, he collected four twelve gauge spent shotgun shells and a twelve. gauge shotgun. He test-fired the weapon in the laboratory and the test hulls were examined and compared with the evidence hulls recovered at the scene and this was done microscopically to determine whether or not the hulls found at the scene were fired from this particular gun. He stated that all four of the evidence hulls recovered at the scene were fired from the twelve gauge shotgun he received at the scene of the shooting.
The body was examined by the Toxicologist at a funeral home in Sheffield where a blood sample showed an alcohol level of .34%. Kilbourn stated that a person with that much alcohol in his system would be highly intoxicated and would have a tremendous loss in muscle coordination. He further said such a person would be nearing a state of unconsciousness.
An autopsy was performed and Mr. Kilbourn described the wounds as follows:
 "A. There were three wounds on the body. One was a three-inch hole, which was noted in the right anterior chest. The wound had around it numerous smaller holes and the diameters across these holes were approximately three and one-half inches. Located just to the right of this wound was a tangential abrasion which measured approximately one inch by three-quarters of an inch. From this wound were removed several pieces of lead shot. There was a one and three-quarter inch hole located on the right hip; four and one-quarter inches below the iliac bone. The periphery of this wound was very rough and irregular, and from this wound I removed two pieces of 12-gauge plastic wadding. The third wound was a one and three-quarter inch hole and it was in the center of the back just above the waist and near the periphery of this hole was noted to be irregular and from this wound one piece of 12-gauge plastic wadding was removed."
On cross-examination this witness said that the deceased was approximately six feet tall and weighed about 230 pounds. He further testified that the wounds sustained by the deceased were such that he *Page 1068 
would go down quite rapidly and would not be able to walk. He stated that the gunshot wound to the back hit the spinal cord and "I would expect this to paralyze the individual, so I wouldn't expect him to advance."
Appellant testified that on April 24, 1975, as he and Randall Wilson were traveling on Cowpen Road a car pulled up in front of them. Mitchell Simpson came out of the car with a knife in his hand. The car in front of appellant was blocking the road. Simpson was standing to the rear of him with an open knife. He saw a big guy whom he believed to be Fish Wright (Joe Wright's brother) get out of the car that was parked 20 to 30 feet from his car and that he was slow, "he was just like he couldn't walk, or you know, real slow like," and the man came toward him with an angry tone in his voice. Appellant reached for his shotgun and shot once into the air, and then shot Wright three times." He claimed there was no way for him to escape with Simpson behind him with a knife and Wright in front of him. He stated he did not see a weapon in Wright's hands but he could see only one hand as Wright had his left hand behind him. He claimed he shot in self-defense.
Appellant was subjected to a vigorous cross-examination and made many contradictory statements and was impeached in many respects.
Rick Thompson was recalled as a rebuttal witness for the State. He stated that he interviewed appellant on April 25, 1975, the day after he killed Joe Wright. Before the interview he gave appellant his constitutional rights by reading from a card containing the Miranda rights and appellant told him he knew and understood his rights. This interview was tape-recorded and transcribed. The proper predicate was laid to show the voluntary character of this statement and it was read to the jury. This statement is as follows:
"STATEMENT OF CHARLES BALENTINE
 "On April 25, 1975, who made statement to RICHARD B. THOMPSON, of Lauderdale County Courthouse, District Attorneys Investigator.
 "Early this morning me and Randy Wilson got together and got off and got to drinking and there was nobody going to shoot anybody. Randy came over and picked me up where I had been staying and that is at Rt. 3, Zip City and that is my Uncle's house, Jessie Phillips. We left there and went to Fox's and bought a case of beer. Warren Cheeks went with me and Randy Wilson. We were in Warren Cheeks' car and later that day he dropped us off at Randy Wilson's uncle's house. Me and Randy ended up at Buck's Place. Mitchell Simpson's car was there and had the keys in it, so I borrowed Mitchell's car because he always is borrowing mine. Earlier in the day, Randy Wilson and I had gone back by Jessie Phillips, my uncle and had gotten my shotgun. The reason why I went to the house to get my shotgun was the more I had thought about things the more I got madder, but I was not planning on shooting anybody. The shotgun had originally belonged to my daddy and while I was in prison, Mavis Balentine kept the gun and when I got out, she gave it back to me. When I got in Mitchell's car, Randy drove his uncle's car back down to the little dirt road just South from the state line and he parked it there. We left Mitchell's car and went to C.W. Lawson's house and he wasn't there so we came back to the dirt road and I had stopped there on the dirt road to talk with Orbie Linvell about a job. I got in the car and left and started back to Cowpen Road and then we got to the intersection of the Dirt Road and Cowpen Road, there Mitchell Simpson pulled out across in front of us. There was another man in the car with him and I thought it was Fish Wright. I didn't even know his brother, Joe, and Mitchell jumped out of the car and came around toward my side and was taking a knife out of his pocket. I told him — Mitchell don't come over to this car with that knife. He saw the shotgun and wouldn't even open his knife then and started backing up. This other guy with him got *Page 1069 
out of the car then and told me to get out of the car and then he told me to get out again. I told him don't come any closer. I thought this man was Fish Wright coming towards me. I didn't see anything in his hand, a gun, knife, or anything at all. Then I shot him two or three times. I don't know why he kept on coming at me because I told him to stay back. During, this time the boy with me, Randy had run off. Earlier that day Randy and I had seen C.W. Lawson in downtown St. Joe, Tennessee. C.W. and his brother, Jimmy were together and I tried to get them to drive me to the Feedmill. The reason why I wanted to go to the Feedmill was because I wanted to see my stepmother and her boyfriend J.V. Odum. C.W. said that he could not take me down there. The reason Randy and I didn't go to the Feedmill was because we didn't know where it was. I knew Mavis would be there with J.V. because she had been staying with him ever since my father's death. I believe there is something funny about this because my dad didn't even know J.V. I believe they had something to do with my father's death and I believe they set it up. The reason why I say this is because I had some information given to me that Mavis was going with him before my father's death. I have heard through different people that Fish Wright did it. I don't know why Mitchell Simpson said that Jimmy Hood did it but I was going to find out yesterday. Yesterday after I shot Mr. Wright, Mitchell and I got in the car and drove off. We got in the white car that belonged to the man that I shot. I didn't think Mitchell would get in the car, he just got in the car with me. I then drove the car to C.W. Lawson's house. We got to his house and both got out and went inside. I sent C.W.'s wife to the store and when I laid the shotgun down to give her some money, Mitchell put the shotgun on me. I sent her to the store to get some beer and more shells. The reason I wanted more shells is because I knew they were going to be after me. I guess the reason Mitchell put the shotgun on me was because he thought I was going to shoot him but I haven't said anything about shooting anybody. I did say in front of Mitchell and Lena Mae Lawson that I thought Mr. Mitchell had something to do with my father's death. Then Lena Mae Lawson said you know Mr. Mitchell had nothing to do with your father's death. When Mitchell had put the gun on me I didn't have but one shell in the gun, so he ran off down through the woods and I got in the car and left and came back to Alabama. I came down Highway 43 and turned down old Jackson Road and that is when I met Mr. Jackson. When I down Bailey Springs Road, I got out of the car and ran in the woods. I stayed in the woods ten or fifteen minutes, then I came out and went to the road and didn't see anything or anybody. So, then, I started back into the woods and everything went black."
There was no motion to exclude the State's evidence; there was no request for the affirmative charge, and no exceptions were reserved to the Court's oral charge to the jury. Appellant did file a motion for a new trial but no testimony was offered in support of the motion. The motion was argued and submitted and was overruled and denied. In this state of the record very little is presented to this Court for review. Jones v. State,55 Ala. App. 466, 316 So.2d 713; Mosley v. State, 54 Ala. App. 59, 304 So.2d 613; Hurst v. State, 54 Ala. App. 254,307 So.2d 62.
In Young v. State, 283 Ala. 676, 220 So.2d 843, the Supreme Court said:
 "Where the evidence presented raises questions of fact for the jury, and such evidence, if believed, is sufficient to sustain conviction, the denial of a motion to exclude the state's evidence, the refusal to give the affirmative charge and the overruling of a motion for new trial, does not constitute error."
This Court has ruled on many occasions that the decision on a motion for a new trial rests largely within the sound discretion of the trial court and that in reviewing that decision we will indulge every presumption *Page 1070 
in favor of the correctness thereof. Clark v. State,54 Ala. App. 217, 307 So.2d 28; Moore v. State, 52 Ala. App. 179,290 So.2d 246; Johnson v. State, 51 Ala. App. 172,283 So.2d 624.
Photographs of the deceased and the locus in quo are admissible in murder prosecutions when they shed light upon the character and location of the wounds on the victim's body and when the proper predicate has been laid. Snow v. State,50 Ala. App. 381, 279 So.2d 552; Boulden v. State, 278 Ala. 437,179 So.2d 20; McKee v. State, 253 Ala. 235, 44 So.2d 781.
The photographs of the victim and the scene of the homicide were properly admitted into evidence.
Appellant contends that he was intoxicated at the time he made the confession and therefore the confession was involuntary and inadmissible. The law is clear that proof of intoxication amounting to mania or such an impairment of the will and mind as to make the person confessing unconscious of the meaning of his words renders a confession so made by him inadmissible, but a lesser state of intoxication will not render the confession inadmissible. The voluntariness of an alleged confession is a question of law for the Court and should be decided by the trial court upon preliminary proof, showing the circumstances surrounding the alleged confession, taken outside the hearing of the jury, and such finding will not be disturbed unless it appears contrary to the great weight of the evidence or is manifestly wrong. Stewart v. State,49 Ala. App. 681, 275 So.2d 360; Daniels v. State, 53 Ala. App. 666,303 So.2d 166.
The rule announced in Stewart, supra, was fully complied with in this case and the confession was properly admitted into evidence.
The motive for a killing is always a proper subject of proof in a murder prosecution. Brothers v. State, 236 Ala. 448,183 So. 433.
There was no error in allowing the State to prove the threats made by appellant to kill J.V. Odum and Mavis Balentine. These persons were members of a class that appellant thought was involved in the death of his father. The wife of the deceased was a sister to J.V. Odum who appellant thought was dating his father's wife before he was killed. The evidence showed that appellant vowed to kill everyone who he thought had anything to do with his father's death. Patterson v. State, 202 Ala. 65,79 So. 459; Miller v. State, 20 Ala. App. 354, 102 So. 153; King v.State, 19 Ala. App. 153, 96 So. 636.
There were numerous requested charges and the trial court gave most of them. The refused charges were adequately and substantially covered in the oral charge or in the other given charges.
Appellant was tried before one of our most experienced and distinguished trial judges and he was represented by able, astute and competent counsel. He received a fair and impartial trial and that is all he was entitled to under the law.
We have carefully examined the record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
Affirmed.
All the Judges concur except CATES, P.J., not sitting.