Appellant was convicted of robbery and sentenced to imprisonment in the penitentiary for ten years. Throughout the trial proceedings he was represented by counsel of his choice and at arraignment pleaded not guilty and not guilty by reason of insanity. Trial counsel represents him on this appeal.
Omitting the formal parts the indictment reads as follows:
 "The Grand Jury charge that, before the finding of this indictment, John Archie Garrison, whose name is to the Grand Jury otherwise unknown, feloniously took $20.40 in lawful currency or coinage, or currency and coinage of the United States of America, a better description of which is unknown to the Grand Jury, of the value of $20.00; one purse, a better description of which is unknown to the Grand Jury, of the value of $8.00; all of the aggregate value of $28.00, the property of Sister Patricia Normanly, from her person, and against her will, by violence to her person, or by putting her in such fear as unwillingly to part with the same, against the peace and dignity of the State of Alabama."
Some time after midday on Friday, February 24, 1978, Sister Patricia Normanly left Loveman's in the Normandale Shopping Center, Montgomery, Alabama, and was walking through the Arcade to her car parked in the rear of the shopping center. As she was walking she was approached from the rear by someone and felt this person pulling on her arm. It was a very cold day and she was wearing a coat that was buttoned. Her purse was partly inside her coat and she had her hand on it. The pulling on her arm frightened her and she "tensed up" and immediately the assailant twisted her shoulders, struck and pushed her. She fell against the brick wall and then on the walkway. She thought she had her pocketbook with her after she was caused to fall but she was more concerned about her injuries and what caused them than she was about her pocketbook. She sustained a gash, cut or laceration on the *Page 57 
top of her head which required eight sutures to close, in the emergency room at St. Margaret's Hospital. She also had a badly skinned knee. After she was hit, mauled, pushed into the wall, and fell on the walkway, she screamed. Several people came to her aid. She never saw her assailant, but she saw a person go through the gateway after she fell.
She further testified that she remembered putting two ten dollar bills in her pocketbook that morning and she had some one dollar bills. She bought the pocketbook at Loveman's and paid $7.50 or $8.00 for it. At trial, she identified her pocketbook which was recovered from appellant.
Mr. Roy Burroughs was employed by Zale's Jewelers on the date of the robbery. He heard a woman scream and he ran to an alleyway across from Zale's and saw a black male running. He gave chase and lost sight of the man at the end of the alley. At that point he heard a car start and he jumped upon a brick wall and saw the car leaving the parking area. He got the tag number of the fleeing automobile. The tag number was BGA-309. When he returned to Zale's, he wrote the tag number on a piece of paper and a female employee of Zale's called the police. When the officers arrived, he gave them the piece of paper with the tag number on it. He identified State's Exhibit 1 as a photograph of the automobile he saw leaving the parking area. He also identified a photograph of the place where the victim was lying on the sidewalk as he passed her, when he was in pursuit of the man he saw running. The photograph of the automobile was introduced into evidence over appellant's objection that it did not accurately portray the entire car. The photograph clearly showed the tag number — BGA-309.
On November 24, 1978, Police Officer Ed Alford was assigned to the Robbery Detail, and he participated in the investigation of the robbery at the Normandale Shopping Center. When the officers arrived at the Arcade in the Normandale Shopping Center they saw the victim who had received medical treatment from the paramedics. They interviewed witnesses and got the tag number of the fleeing car. The tag number was traced to a person living at 210 Martin Patton Avenue. He identified State's Exhibit 1 as a photo of a yellow Pinto automobile which had been used after the commission of this offense. This car was registered in the name of Wilbur Garrison. They went to 210 Martin Patton Avenue and saw a yellow Pinto which had been backed into the driveway. Officer Alford went to the front door at this address and knocked on the door while Detective Wilson and uniformed Officer Shirley went to the rear of the house. An elderly woman came to the front door and Officer Alford identified himself as a police officer and asked her who owned the car parked in the driveway. She told him the car belonged to Wilbur Garrison but he was not at home. He asked her who had just parked the car there and she replied that John Archie Garrison had parked the car. He asked the woman if John Archie was home and she stated he was and invited him in the house. Officer Alford entered the house and was met by a young black male whom he searched for weapons. He asked appellant if he knew why the officers were there and he replied, "I am sorry, that's the first time I've ever snatched a purse and I didn't mean to hurt the lady." Officer Alford then gave appellant theMiranda rights and warnings, and handcuffed him. Officer Alford stated no threats, promises, or other inducements were made or held out to appellant to get him to make a statement.
Alford further testified that appellant produced the clothing he was wearing on that occasion and showed the officers where he had hidden the pocketbook under the house. They recovered the pocketbook and as they were about to leave the house appellant told them he had removed the money from the pocketbook and hid it under a sofa pillow in the living room. Alford told appellant's grandmother that appellant told them the money was under a sofa pillow in the living room. She stated she did not want any part of it and if it was there to get it out of her house. Alford then picked up the sofa pillow and found a wad of *Page 58 
money and placed it in his badge case. State's Exhibit 7, a photograph depicting the sofa where the money was found, was introduced into evidence without objection.
Detective J.T. Roy also took part in the investigation of this crime and he was present when appellant showed them where he hid the purse and it was recovered by Officer Roy.
Officer Alford and Detective Wilson escorted appellant to police headquarters. In the car on the way to the station house Detective Wilson again advised appellant of his constitutional rights. When they arrived at the station house appellant was turned over to Detective J.T. Roy. The time was between 1:30 and 2:00 p.m. Appellant signed a waiver of rights form and made a confessory statement.
An extensive voir dire hearing was held out of the presence and hearing of the jury to determine the voluntariness of the waiver of rights form and the confessory statement. The proper predicate was laid showing that no threats were made to appellant, and no promises, coercion, hope or reward, or other inducements were made or held out to him to get him to execute the waiver form or to sign the confessory statement. At the conclusion of this hearing the court ruled that appellant voluntarily, and with full knowledge of his constitutional rights, freely signed both documents.
The waiver of rights form is as follows:
"CITY OF MONTGOMERY, ALABAMA DEPARTMENT OF POLICE
John Archie Garrison B/M 20 Ed: 1st yr. Coll.
NAME
Detective Office MPD
PLACE
February 24, 1978
DATE
4:00 PM
TIME
Robbery Assault to Murder
CHARGE
 "Before asking you any questions, I must explain to you that you can remain silent, that anything you say can be used against you in court, that you can talk to a lawyer first and that you have the right to the advice and presence of a lawyer even though you cannot afford to hire one. If you cannot afford to hire a lawyer and want to have one present during interrogation, the Court will appoint one before we question you. If you want to answer questions now, you can do so, but you can stop answering at any time.
 /s/ J.T. Roy, Sr.
OFFICER
J.T. Roy, Sr., Detective
 "I fully understand the foregoing statement and do willingly agree to answer questions. I understand and know what I am doing. No promise or threats have been made to me by anyone and no pressure of any kind has been made against me by anyone.
 /s/ John Archie Garrison
John Archie Garrison
"WITNESSES:
 /s/ J.T. Roy, Sr.
__________________ __________________"
The confessory statement is as follows:
 "February 24, 1978 Friday 4:05PM
"Statement taken from: John Archie Garrison B/M
Statement taken by: J.T. Roy, Sr., Detective
 Statement Subject: Robbery Assault to Murder at Normandale Arcade 2-24-78 at 12:40 PM: RE: Reports # 2886 2892 Sister Patricia Normanly
 "When I got up this morning, I turned on my stereo and it started smoking. I asked my grandmother if I could take it to Southern Sound to get it fixed. I took it up there and gave it to the guy that works there. He didn't tell me how much it would be to fix it, but I knew that it would be a lot. There was a lot wrong with it. I didn't know where I was going to get the money. I sat in the car a long time and was watching the ladies with their purses coming out. I thought about the guy that was in the paper and on the news and figured that if I did it maybe *Page 59 
they would blame it on him. I got out of the car and went through a little alley and stood there. I seen the old lady and walked past her. I ran back and grabbed her purse and ran. I got in the car and went home. I went and put the purse under the house. I took the money out and hid it in the house. My grandmother asked me what was wrong with me and I told her what I had done. She told me to get the purse and the money and when my uncle got home we would take it to the police. I took a bath and then laid on the bed talking to my grandmother and then the police came.
"Q: What time was it when you went to Southern Sound?
"A: I'm not sure.
Q: Where did you go when you left your stereo?
 "A: I went home and told my grandmother that I had put it in the shop and drove back up to Normandale Shopping Center.
"Q: Why did you back your car into the drive?
 "A: My grandmother can't back up so she tells me to back it in.
"Q: Did anyone chase you after you took the purse?
 "A: Yes, a white guy, I guess it was the one who got the tag number.
"Q: Did you run right to the car?
 "A: Yes, I went to the car and he was at the wall. I went right home.
"Q: Did the woman struggle with the purse?
 "A: When I pulled the first time there was a little resistance, then on the next pull she let go. When she fell I heard her holler, `Oh, God.'
"Q: Did you know that she was a nun?
"A: No, I had never seen her before.
"Q: How much money was in the purse?
"A: I didn't get a chance to count it.
"Q: Is there anything else you can tell me?
 "A: It wasn't very much money in there. There was two 10 dollar bills and the rest ones.
 "I, John Archie Garrison, have read the above statement and it is true and correct to the best of my knowledge.
/s/ John Archie Garrison 2-24-78
/s/ J.T. Roy, Sr."
Appellant offered the testimony of several character witnesses who testified that his character and reputation were excellent, and that he was generally regarded as an honest and peaceful person in the community.
Appellant's grandmother, Eliza Harrison, testified that she did not invite the police officers into her house. She did admit that she told the officers that appellant was driving the car on the date of the robbery.
Appellant testified that he lived with his grandmother his entire life. He stated that Officer Alford entered the house without knocking and his grandmother became terribly afraid. He said in order to prevent his grandmother from being scared he told the officer: "I'm the one you are looking for." He denied he made inculpatory statements to the police. He stated that he was not advised of his rights until he was placed in the police car. He said the officers told him that the victim was in critical condition and had received 38 stitches. He said he told the officers that he never touched the victim. He admitted that he grabbed the pocketbook and ran.
Appellant claimed that he was questioned for two hours and was urged to confess to 12 other purse snatchings. He stated that he was not permitted to call anyone. He denied telling the officers that he met resistance when he grabbed the purse and he denied that the victim fell.
On cross-examination appellant identified a photograph as the alleyway through which he ran. He admitted he approached the victim from behind, and that he took the pocketbook with very little resistance. He denied that he was read his constitutional rights while he was within the house. He admitted that he signed the waiver of rights form, but he did not read everything that he signed. Appellant stated he understood his rights when they were given him *Page 60 
and he admitted he told the officers that he took the purse.
Appellant contends that the State's evidence is insufficient to constitute the crime of robbery. We do not agree.
There are three essential elements of the crime of robbery. They are: (1) felonious intent, (2) force, or putting in fear as a means of effecting the intent, and (3) by that means of taking and carrying away of the property of another from his person or in his presence, all of these elements concurring in point of time. Summers v. State, Ala.Cr.App., 348 So.2d 1126, certiorari denied, 348 So.2d 1136; Tarver v. State, 53 Ala. App. 661, 303 So.2d 161; Crutcher v. State, 55 Ala. App. 469,316 So.2d 716.
It is true that the victim was not put in fear as she did not see her assailant as he pounced upon her from behind. That appellant used force cannot be gainsaid by the testimony of the victim. Appellant hit her and twisted her shoulders, pushed or knocked her against the wall, forcibly took her pocketbook and ran away. Prior to assaulting the victim appellant parked his car in the Normandale parking lot for approximately thirty minutes and watched women carrying their purses. He deliberately chose the victim as his quarry as she was walking alone and he thought she would be easy prey. The question of intent was for the jury and the verdict of the jury resolved this issue against appellant. Crutcher v. State, supra; Root v.State, 247 Ala. 514, 25 So.2d 182; Gibson v. State, 49 Ala. App. 18, 268 So.2d 49.
The loss of property by a felonious taking may be proved by facts and circumstances as well as by direct and positive evidence. Baker v. State, Ala.Cr.App., 344 So.2d 547; Gross v.State, 56 Ala. App. 387, 321 So.2d 727.
Appellant claims that his confession was not voluntary and should have been excluded. An extra-judicial confession, oral or written, is prima facie involuntary and inadmissible and duty rests in the first instance on the trial court to determine whether the confession is voluntary, and, unless it so appears, it should not be admitted. Pike v. State, Ala.Cr.App., 340 So.2d 865; Rainer v. State, Ala.Cr.App.,342 So.2d 1348; Hardin v. State, Ala.Cr.App., 344 So.2d 234.
The voluntariness of an alleged confession is a question of law for the court upon preliminary proof, showing the circumstances surrounding the alleged confession, taken outside the hearing of the jury, and such finding will not be disturbed on appeal unless it appears contrary to the great weight of the evidence or is manifestly wrong. Balentine v. State, Ala.Cr.App., 339 So.2d 1063, certiorari denied, Ala.,339 So.2d 1070; Stewart v. State, 49 Ala. App. 681, 275 So.2d 360.
The rule announced in Balentine and Stewart, supra, was fully complied with in this case and the confession was properly admitted into evidence.
Before the officers asked appellant a single question concerning the alleged robbery he said, "I am sorry, that's the first time I've ever snatched a purse and I didn't mean to hurt the lady." This was a "spontaneous exclamation" and admissible evidence. Alabama Digest, Criminal Law, 364 (4).
Finally, appellant urges this court to reverse the conviction for failure to give his written requested charge number 6:
 "The Court charges you, gentlemen and ladies of the jury, that if, upon considering all the evidence, you have a reasonable doubt about the guilt of the defendant, arising out of any part of the evidence, you must find the defendant not guilty.
 "If the evidence, or any part thereof, after a consideration of the whole of such evidence, generates a well-founded doubt of Defendant's guilt the jury must acquit him.
 "The Court further charges you that the term `reasonable doubt' means a doubt which has some good reason for it arising out of the case. It means such a doubt as would cause a prudent man to pause and *Page 61 
hesitate before accepting as true and acting upon any matters alleged or chartered in the more important matters of life. Gentlemen, if, upon a careful and and candid review of all the evidence, you ask your inward conscience, `Is he the guilty one?' and the answer is, `I doubt it,' you must acquit. Absolute certainty is not required, there must be a reasonable doubt."
The court orally charged the jury on the meaning of a reasonable doubt in the following language:
 "The term, reasonable doubt, means a doubt which has some good reason for it arising out of the evidence in the case. Such a doubt as you are able to find within the evidence a reason for. It means an actual, substantial doubt, it does not mean a doubt which arises from a mere whim or from a groundless surmise or guess. While the law requires you to be satisfied of the defendant's guilt beyond a reasonable doubt it at the same time prohibits you from going outside the evidence to hunt up doubt upon which to acquit the defendant. In arriving at your verdict it's your duty to carefully consider the entire evidence in the case and in so doing you should entertain only such doubts as arise from the evidence and are reasonable as that has already been defined. Unless a doubt is a reasonable one and does so arise it will not be sufficient in law to authorize a verdict of not guilty. Then if upon careful review of all the evidence you ask your inward conscience, is the defendant guilty, and the answer is, I doubt if he is, you should acquit, but if the answer is, I have no reasonable doubt about it, then you should convict." (Emphasis supplied).
It is clear from the language of the oral charge on reasonable doubt "arising out of the evidence," and "within the evidence," after carefully considering "the entire evidence," "you should entertain such doubts as arise from the evidence," that the jury was properly charged on the law of reasonable doubt. This seems to be the holding of the Supreme Court inKing v. State, 356 So.2d 1220 and Dillard v. State, 78-184-ms., released by the Supreme Court on May 4, 1979.
In our judgment the third paragraph of refused charge number 6 containing the phrase "acting upon any matters alleged or chartered in the more important matters of life" renders the charge confusing and misleading. Where several instructions are requested in bulk, and any one is improper, all may be refused.Colley v. State, 167 Ala. 109, 52 So. 832; Brown v. State,50 Ala. App. 702, 282 So.2d 322.
The trial judge charged the jury on the lesser-included offenses of larceny, assault with intent to rob, assault and battery, and simple assault. As we view the evidence the charge on lesser-included offenses was far more than appellant was entitled to. The evidence presented by the State proved a clear-cut case of robbery, and the oral charge gave appellant more than he was due.
We have carefully searched the record for errors injuriously affecting the substantial rights of the appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.