BOOKOUT, Judge.
First degree burglary; sentence: 150 years’ imprisonment.
This case is the culmination of a massive investigation in Madison County involving burglaries and sexual attacks on women commonly referred to as the “Southwest Molester” case.
Around 10:30 p. m. on September 19, 1979, the prosecutrix saw that all the doors and windows of her house were closed, and she went to bed. In the early morning hours before daylight, she was awakened by a man standing over her. He bound and gagged her and put tape over her eyes. He *241 likewise bound her seven-year-old son who was in the bed with her.
The assailant rolled the prosecutrix off the bed and cut her clothes off her. He then cut her inside the vagina, down the length of one leg, and around the breast area. However, he did not rape her. Before leaving he demanded money, but she had none.
During the ensuing investigation, a passer-by informed the police that he had seen a “small blue car” parked in the area close to the scene of the crime around the time in question. Officers made plaster casts of tire prints found in the soft ground in the area and took them to local tire dealers for possible identification. They found the tread pattern to be that of a Bridgestone tire, a brand of tire used as standard equipment on Japanese cars such as Honda, Subaru, Toyota, Mazda and Datsun. The condition of the tire tread indicated it had been driven for 4,000 or 5,000 miles.
With the tire brand known, the officers then went to a foreign car dealer in the area. They found the tire print to match exactly the tires on a new Subaru. The Subaru dealer gave the officers the name of the appellant from a sales contract, and a background investigation was started on him. Officers found that the appellant had been charged earlier with an offense in Alton, Illinois, which had many similarities to the offense being investigated. A further check with the Alabama Department of Public Safety revealed that the appellant had an Alabama driver’s license which had expired.
Based upon the above information, Huntsville Police Detective Charlie Norment sent officers to arrest the appellant and bring him in for questioning. The appellant was arrested while driving his automobile and was brought to the police station on September 21, 1979, around 6:30 p. m. No warrant for his arrest was procured prior to his questioning although one of the officers swore out a warrant after he was questioned.
The appellant argues two grounds for reversal on appeal: (1) that his warrantless arrest was illegal for lack of probable cause, thereby making his later confession inadmissible, and (2) that the confession was improperly induced as the result of promises made to obtain psychiatric help for him and to drop all but one charge if he made a statement.
I
Section 15-10-3, Code of Ala.1975, provides that an officer may make a warrant-less arrest when “a felony has been committed and he has reasonable cause to believe the person arrested committed it.” Pursuant to that section, our courts have held that a warrantless arrest of a defendant is lawful where the officer had reasonable cause to believe the person arrested committed a felony. Seals v. State, 282 Ala. 586, 213 So.2d 645 (1968); Aaron v. State, 54 Ala.App. 71, 304 So.2d 625 (1974).
In Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed.2d 1879 (1949), it is stated:
“The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating .. . often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers’ whim or caprice.”
In Maples v. State, 44 Ala.App. 491, 214 So.2d 700 (1968), our former court of appeals adopted á statement from Schook v. United States, 337 F.2d 563 (8th Cir. 1964):
“ ‘Reasonable grounds for suspicion when accompanied by facts or circumstances strong enough to justify a reasonably cautious man to believe the guilt of the suspect, suffice to constitute probable cause necessary for arrest without warrant.’ ”
See also Miller v. State, 53 Ala.App. 213, 298 So.2d 633, cert. denied, 292 Ala. 741, 298 So.2d 639 (1974).
In the instant case, the facts unearthed by the investigating officers clearly establish reasonable or probable cause to *242 believe the appellant committed the instant offense. Therefore, on determining that probable cause to arrest existed, the next question is whether the arrest was legal where the officers failed to formally procure an arrest warrant before making the arrest.
In Rickman v. State, Ala.Cr.App., 361 So.2d 22, reversed, Ala., 361 So.2d 28 (1978), officers had probable cause to obtain a search warrant at 11:00 a. m. on the particular day in question. However, they failed to obtain a warrant and instead set up surveillance at a particular point around 1:00 p. m. and waited for the appellant to arrive by automobile. The appellant appeared at 4:15 p. m. and was stopped, seized and searched at that time without a warrant. Our supreme court held that the officers, on first having probable cause, were not required to obtain a warrant before making the seizure. The court there cited United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950), which held:
“The judgment of the officers as to when to close the trap on a criminal committing a crime in their presence or who they have reasonable cause to believe is committing a felony is not determined solely upon whether there was time to procure a search warrant. Some flexibility will be accorded law officers engaged in daily battle with criminals for whose restraint criminal laws are essential.”
In another case dealing with the fourth amendment, more particularly automobile searches, the Supreme Court in Cardwell v. Lewis, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974), said:
“Assuming that probable cause previously existed, we know of no case or principle that suggests that the right to search on probable cause and the reasonableness of seizing a car under exigent circumstances are foreclosed if a warrant was not obtained at the first practicable moment. .. . The exigency may arise at any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation’s necessitating prompt police action.”
In the instant case, for all the investigating officers knew, the appellant may have been committing or preparing to commit another sexual assault at the time his arrest was ordered. Considering the circumstances surrounding this case, we do not find that it was mandatory for the police officers to first seek out a magistrate and attempt to obtain an arrest warrant before dispatching officers to pick up the suspect and bring him to the police station.
Both Brown v. Illinois, 442 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), and Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), held confessions to be invalid which were obtained after warrantless arrests not based upon probable cause. In both of those cases, the arrests were based on mere suspicion which was the reason they were held to be invalid. Neither of those cases hold an arrest based upon probable cause to be invalid merely because a warrant was not first obtained. In fact Rawlings v. Kentucky, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), held that incriminating statements, freely given during the course of a warrantless detention, were admissible under the circumstances set out in that case. There, the petitioner was detained with others at a residence while the police sent for a search warrant after smelling marijuana on the premises. The petitioner, while being detained without probable cause, made certain incriminating statements. The Supreme Court found the statements to be admissible where the illegal detention was about forty-five minutes in length, where there was a “congenial atmosphere” between the officers and the petitioner, and where his statement was shown to have been freely given and not obtained through coercion. In that instance that Court found the petitioner’s statements to have been “unaffected by the initial illegality.”
In the instant ease, the appellant was taken into custody around 6:30 p. m. and was questioned after being given the Miranda warning. Miranda and voluntariness predicates were established to the satisfac *243 tion of the trial court. The appellant consented to a search of his apartment and around 8:30 or 9:00 p. m. went with the two officers to the apartment and stayed with them during the search. He was not handcuffed and was free to use the bathroom and move around. On the way to the apartment, the officers bought him food when he said he was hungry. They returned to the police station around 11:00 p. m.
When the officers and the appellant returned to the police station, he requested to talk with his brother and his employer. They were called by the officers, and all questioning stopped until after they arrived and talked with the appellant. . After the three finished talking in private, outside the hearing of the officers, the appellant indicated that he wanted to make a statement, and he then gave a confession in the presence of the officers and his brother and employer around 2:00 a. m.
The fact of custody alone has never been enough in and of itself to demonstrate a coerced confession. United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). An illegal arrest, without more, does not bar a subsequent prosecution. Neither is it a defense to a valid prosecution. United States v. Crews, 445 U.S. 463, 100 S.Ct. 1244, 65 L.Ed.2d 537 (1980). Thus, the next question is whether the confession was voluntarily given.
II
The trial court heard several witnesses on the question of the voluntariness of the appellant’s confession. Huntsville Detective Wayne Sharp initially established the Miranda and voluntariness predicates. He also testified that just prior to the search of the apartment the appellant brought up his need for psychiatric treatment, and the officers told him it would be left entirely up to the court system. The witness said that neither he nor the other investigator with him made any statement to the appellant nor inferred to him that if he would confess to the instant crime that the other cases would be dropped.
The appellants brother, Ludvik Dejnoz-ka, testified that when he came to the police station on the night in question he had a conversation with police officers and Charles Hooper from the district attorney’s office. He said he was told that they wanted to get a confession from his brother, and it was mentioned on several occasions that his brother needed psychiatric help. Likewise, he said he was told that if his brother confessed it was likely that all the other charges would be dropped, and “it would probably be treated as one charge not as a total list of charges.” The witness said Mr. Hooper “indicated” to him that his brother would receive mental care although he did not actually say so. The witness conveyed this to his brother prior to the confession.
The appellant testified in his own behalf at the hearing, and the following took place:
“Q. Did either or both of the officers mention anything to you about only making one case against you?
“A. At that point nothing was mentioned in that context. During the early part of the evening, the primary emphasis seemed to be toward the fact that I needed psychiatric care and they even went to the point of discussing a supposed FBI profile that had been made on my type of case, describing the type of character and so on that would be involved in this type of situation.
“Q. Did you tell them that you felt that you needed psychiatric care?
“A. I didn’t tell them anything during the whole first half of the evening, as I am sure that the officers would testify.
“Q. Did they tell you that they could get you psychiatric care?
"A. They definitely conveyed the idea that the only hope that I had was for their positive testimony saying that I was cooperative and would talk to the officers and if I would not cooperate there was no chance.

“Q. Do you recall whether or not the officer said to you that they would only charge you on one charge?
*244 “A. They did not specifically say that to me, no, sir. They, in fact, like I said nothing was said about that in the early part of the evening. All of the discussions concerning possible imprisonment or how many charges that I would be imprisoned under came later on in the evening after we had left the police station and come back. Now, at that time, there definitely was talk of that in fact.
“Q. What was said?
“A. Specifically, I believe, that it was Detective Sharp, although I couldn’t swear to that, but one of the officers did tell me on that one case alone, first degree burglary in this state there is ten year to life and that they had enough to lock me up for good any way, so it really didn’t make any difference.”
Appellant likewise testified that:
“My brother told me that he had talked to Charlie Hooper, that he had talked to the police officers out there, that I would be charged with a single charge of burglary which carries ten to life, that if I made a complete confession that that is the only one I would be charged with because they could get me any amount of time they wanted on that.”
The appellant’s employer likewise testified at the voluntariness hearing. From the record:
“Q. Mr. Reed, do you remember anything — conversation between you and D. J. and Mr. Hooper or any police officers wherein the defendant was promised that he could go to a psychiatric hospital and that he would never go to jail?
“A. Not in that word, no sir, I think the wording was he needs help and that he needed to be put where he could get psychiatric care but not in those words that you put it, Mr. Simpson.
“Q. Well, did you tell the defendant that he was not going to jail?
“A. No, sir.”
Charles Hooper, an assistant district attorney, took the stand and testified as to the conversation he had with the appellant’s brother and employer prior to the confession:
“Q. Did you ever make a statement to Mr. Reed and to the defendant’s brother that he, the defendant, would only be charged with one offense?
“A. I never used the term one offense. He asked me what was fixing to happen and I told him that he was fixing to be charged with this offense.
“Q. For the Miller Lane offense?
“A. For the Miller Lane offense, but all — in fact I used the term all, I said all of this evidence will be submitted to the grand jury and.it will be ultimately up to the grand jury.
“Q. Did you say to Mr. Reed and to the defendant’s brother that he would not go to jail but would go to a psychiatric institution or the like?
“A. No, sir; D. J. asked me that; he asked me — said I am concerned about my brother’s mental state and he said, you know, what is going to happen and I told him that that was not up to me that that would be up to the court.”
Officer Charlie Norment was recalled as a witness for the State. He said he was present when Hooper had the conversation in controversy with the appellant’s brother and employer. The record reveals the following, in pertinent part:
“Q. Did you hear Charlie Hooper or anyone in your presence — well, let’s just discuss Charlie Hooper, did you hear Charlie Hooper tell Mr. Reed or the defendant’s brother that he would be charged, that the defendant would be charged only on the Miller Lane case and no other?
“A. No, sir.
“Q. Did you hear Mr. Hooper tell these gentlemen, in your presence that the defendant could go to a mental institution and not go to prison?
“A. No, sir.
“Q. Did anyone else in your presence then or at any other time tell Mr. Reed or the defendant’s brother that he would be charged with only one crime and not all of the others?
“A. No, sir, the only conversation that I heard was that they wanted to be ex *245 plained the system of the process and that we would charge, there would be one charge as far as that night and the rest of the case — or whatever would be presented to the courts and would be out of our hands. That is the idea that I got that they wanted us to explain the system and that the attorney would probably ask for a psychiatric examination and so forth.
“Q. But the conversation was that the police department would charge him with only one crime that night?
“A. Well, yes, sir, we were going to charge on this particular case that night, but the other evidence and so forth on the other cases would be presented to the court and it would be out of our hands and that is the idea that I thought was being given across to the brother and to the defendant.”
When a defendant challenges the voluntariness of his confession, he is entitled to a reliable and clear-cut determination that the confession was voluntarily rendered. Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). That issue must first be heard in camera and decided as a matter of law by a trial judge. Lewis v. State, 57 Ala.App. 545, 329 So.2d 596 (1975), affirmed, 295 Ala. 350, 329 So.2d 599 (1976). Once the trial judge has heard the evidence at such a hearing and makes his decision, it will not be disturbed on appeal absent a showing that it was manifestly wrong and against the great weight of the evidence. Balentine v. State, Ala.Cr.App., 339 So.2d 1063, cert. denied, Ala., 339 So.2d 1070 (1976). The federal standard applied is that the trial judge must be satisfied of the voluntariness of the confession only from a “preponderance of the evidence,” although the states may adopt a higher standard. Lego v. Twomey, supra. Alabama follows the “preponderance of the evidence” standard. Baldwin v. State, Ala.Cr.App., 372 So.2d 26, affirmed, Ala., 372 So.2d 32 (1978).
This court stated in McNair v. State, 50 Ala.App. 465, 470, 280 So.2d 171, cert. denied, 291 Ala. 789, 280 So.2d 177 (1973):
“Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty-”
The excerpts from the record herein-above set out are certainly sufficient to support the decision of the trial judge that the confession was voluntarily given by the appellant, whether the standard applied is that of “preponderance of the evidence,” “great weight of the evidence,” or “substantial evidence.”
Ill
The judgment entry states that the appellant was indicted “on a charge of Burglary 1st Degree, and Assault with Intent to Ravish.” The judgment entry states that the appellant “is adjudged guilty of Burglary in the First Degree and Assault with Intent to Ravish.”
The indictment does not charge the appellant with assault with intent to ravish. The indictment contains two counts of first degree burglary only. Count I charges the •nighttime breaking and entering into an inhabited dwelling with intent to steal, and Count II charges the nighttime breaking and entering into an inhabited dwelling with intent to ravish. Each count therefore charges the same breaking and entering but with different intents, thus charging first degree burglary in two separate counts. Section 13-2-40, Code of Ala. 1975.
Section 15-17-3, Code of Ala. 1975, provides:
“When the intent with which, the mode in or the means by which an act is done is essential to the commission of the offense and such offense may be committed with different intents, in different modes or by different means, if the jury is satisfied that the act was committed with one of the intents, in one of the modes or by either of the means charged, it is sufficient; and the jury must convict, al *246 though uncertain as to which of the intents charged existed, in which mode or by which of the means charged such act was committed.”
In the instant ease, one breaking and entering was charged, but with a different intent. The jury in finding the appellant “guilty as charged” was apparently convinced that the appellant committed the overt act charged, “although uncertain as to which of the intents charged existed.” In such a case, § 15-17-3, supra, states that “the jury must convict, although uncertain as to which of the intents charged existed.”
In reviewing the record, it appears that the trial court properly charged the jury on first degree burglary and explained the two separate intents charged in the two counts of the indictment. After the jury returned its verdict of guilt, the trial court verbally passed sentence by stating: “In accordance with the verdict of the jury, you are adjudged guilty and it is the sentence of this court that you be placed in the state penitentiary for a period of 150 years.” There was no reference to the crime of assault with intent to ravish (§ 13 — 1—46) prior to the formal preparation of the judgment entry. We therefore conclude that the judgment entry is in error. The appellant’s conviction and sentence for first degree burglary is hereby affirmed, but the cause is remanded to the circuit court with directions to correct the judgment entry to reflect the correct charge set out in the indictment and the correct charge upon which the verdict, sentence and judgment were rendered.
AFFIRMED; REMANDED WITH DIRECTIONS. •
All the Judges concur.