HARRIS, Presiding Judge.
Appellant was convicted of murder in the first degree and the jury fixed his punishment at life imprisonment in the penitentiary. He was sentenced accordingly. Throughout the trial proceedings he was represented by court-appointed counsel and at arraignment interposed a plea of not guilty. After sentence was pronounced he gave notice of appeal and was furnished a free transcript. Trial counsel represents him on appeal.
Omitting the formal parts the indictment reads as follows:
“The Grand Jury of said County charge that, before the finding of this indictment, Fred Davis, alias, Fred David, alias, Bill Davis, whose name is to the Grand Jury otherwise unknown, unlawfully, and with malice aforethought, killed L. E. Fuller, Jr., by beating him with a pipe or by means otherwise unknown to the Grand Jury, against the peace and dignity of the State of Alabama.”
It was not disputed that the cause of death was due to a skull fracture, brain contusions, inter-crania bleeding, due to blunt force injuries to the head.
The deceased was last seen alive by his wife on November 12,1977, at Fuller Furniture Company, in the Powderly Community of Jefferson County. The next time she saw him was on November 18 at Elmwood Chapel. In her words, “He was deceased.” She was shown State’s Exhibit 1 and identified it as a photograph of his truck which was parked at the place of his business on November 12, 1977, when she last saw him alive.
Police Officer Donny Todd, an evidence technician with the Birmingham Police Department, testified that he was called to a vacant house in the Ishkooda section of Birmingham on November 17, 1977, where he and a fellow officer found the body of L. E. Fuller, Jr., who had apparently died as the result of a blow to the head. A piece of iron pipe was found near the body. Officer Todd took the pipe to police headquarters and left it on the desk of the Crime Labora *270 tory Supervisor Robert Johnson. At trial Officer Todd identified State’s Exhibit 9 as being the identical pipe he found near the body of the deceased and stated that it was in the same condition as it was when he picked it up at the scene. He identified several photographs of the crime scene depicting the body of the victim and these were introduced into evidence.
Officer Robert B. Johnson, Supervisor of Scientific Investigation with the Birmingham Police Department, testified that the pipe was left on his desk in a sealed package with a receipt form indicating that it had been put on his desk on November 19, 1977, by Officer D. D. Todd. The pipe was in a bag which had been taped together. He stated the pipe was constantly in his possession from the time he found it until he personally delivered it to the Toxicology Department on December 1, 1977. At the time he delivered it to the Toxicology Department the pipe was in the same condition as it was when he received it. He further stated that he received three packages, “one of them containing a ‘lead pipe,’ and the other one was an envelope that was sealed and labeled as containing some sort of fiber and the third one was an envelope sealed and containing some sort of a paper object.” He was asked who had access to his office and he replied, “The Evidence Technician and myself.”
Officer Johnson stated that he made a preliminary investigation of the pipe and found a reddish brown stain. which contained a hair which he removed and sealed in another envelope and took the hair and the other items to the Department of Toxicology.
On cross-examination he testified that about twelve evidence technicians had keys to his office at that time, but there was no indication that anyone touched or disturbed the items left on his desk by Officer Todd. He resealed the lead pipe and the other items before he delivered them to the Department of Toxicology.
In the course of the homicide investigation arrest warrants were issued for three suspects. They included Joseph Hardman, Tommy Battle and appellant. During a voir dire hearing out of the presence and hearing of the jury Officer William T. Gant testified that he interrogated appellant on January 5, 1978. Prior to asking him a single question the officer furnished him a form containing the Miranda rights and warnings and requested that he follow the form as it was read to him. He asked appellant if he could read and write and received an affirmative answer. After reading the waiver of rights form to appellant the officer asked him if he understood his rights and appellant assured him that he did. Appellant then signed the waiver form and told the officer he would make a statement. The officer further testified that no promises were made to appellant to get him to make a statement; that no threats were made against appellant, and no rewards or hopes thereof were offered or held out to appellant or other inducements made to him to get him to make a statement concerning his involvement in the crime. Appellant then made an oral statement admitting his participation in the robbery and the homicide. The officer then requested appellant to repeat the statement while the officer wrote the statement-in the words of appellant. Appellant agreed, and as he related the events leading up to the robbery and killing, the officer printed his statement. After printing the statement the officer read it back to appellant and asked him if it was correct. Appellant stated the statement was correct and initialed the first page and signed his name on the last page. His signature was witnessed by Officer Gant and Officer Albert Wallace.
The statement follows:
“He stated, Me and Joe Hardman and Tommy Battle got together around Tommy’s house on the morning before Mr. Fuller was killed. Me and Joe had stolen a t.v. and we were walking to Fuller’s to sell it to him when we met Tommy who was in the ear with his mother and Joe’s grandmother. We rode back to Tommy’s house and was going to get Tommy to drive us to Fuller’s place but Tommy couldn’t get the car from his mother. So, *271 me and Joe and Tommy got to talking about needing money and Tommy suggested that we rob Mr. Fuller. Tommy said we would have to kill him because he would recognize us. I told him that we could rob Fuller but we didn’t have to kill him. Tommy and Joe both said we would have to kill him but they finally agreed that we would just rob him. Me and Joe then walked to Powderly to get Fuller to come back with us. We told him that we had a hot t.v. to sell to him. Fuller drove us back up on the hill in the truck. I rode up front with Fuller and Joe rode in the back. When we got there Joe went in first and I went in and was showing the t.v. to Fuller. Fuller went to the back of the house, looking around and that’s when Joe hit him with a rock. After Fuller fell down Joe hit him about two more times. I went in his pocket and got his billfold out and then me and Joe left and went into the woods behind the house. We stopped and split up the money which was about a total of a hundred or a hundred and fifty dollars. W.e then went to Joe’s house and after about five minutes I left. Joe did all the hitting and I never hit Fuller at all. I just was going to rob him and I thought Joe was only going to rob him until Joe actually killed him. Tommy got one third of the money because he said he set everything up. He called himself being in the clear because he was outside the house when Fuller was killed. And, then, it’s signed by Mr. Davis and witnessed by myself and Albert Wallace with a notation of City Jail, the ■ date 1/5/78, and the time 12:50 p. m.”
At the hearing on the motion to suppress the defense presented the testimony of Dorothy Jean Reynolds, a former elementary school classmate of appellant. This witness testified that appellant dropped out of school during the sixth grade; that appellant could only read a few words; that she had never seen him read a book, newspaper, or magazine, and that she had offered him a Bible to read but he declined because of his inability to read.
Appellant’s mother testified that he could not read and had received bad grades while in school. She stated that she had never seen him read any printed material and had never seen him write anything.
Appellant testified at the same hearing and said he had dropped out of school in the sixth grade; that he had repeated two grades before dropping out of school. He said he could write his name but could not read. He claimed that after signing the statement transcribed by Officer Gant he handed the statement back to him saying he could not read. He further testified that Sergeant Gant told him that the two other suspects were trying to put it all on him. He claimed that the officer told him if he didn’t make the statement he would get the death penalty. He further claimed that the statement signed by him was different from his original statement.
It should be noted here that after Officer Gant read the statement back to appellant he asked him if he wanted to make any changes and appellant said no — and he did not make or suggest any changes.
At the conclusion of the voir dire hearing the trial court ruled that the confession was voluntarily, knowingly and understandingly made. Back before the jury the State laid the voluntariness predicate and appellant’s confession was admitted into evidence.
Appellant makes three contentions on this appeal in which he claims reversible error was committed by the trial court: (1) The confession was not shown to be voluntary, (2) the chain of custody of the alleged murder weapon was not sufficiently connected to justify its admission into evidence, and (3) that he was denied his right to a speedy trial guaranteed by the Sixth Amendment to the United States Constitution.
In support of contention number (1) appellant relies in part on the fact that he is alleged to be illiterate. In Arnold v. State, Ala.Cr.App., 348 So.2d 1092, this court held:
“The appellant also alleges that the trial court committed reversible error in the admission of the confession of the appel *272 lant. The central contention raised in this regard is that the appellant did not make a free and intelligent waiver of his rights because the appellant was ‘slow’ and illiterate. Specifically there was testimony that the appellant was ‘slow’, was below normal intelligence, could only read and write a little, had only completed the eighth or ninth grade in school, could not spell the words ‘rights’ and ‘waiver’, could not give a definition of ‘understand’ at trial, and did not know what ‘waiver’ and ‘to waive’ mean.
“At a hearing to determine the admissibility of the confession held outside of the presence of the jury, the state presented testimony that the appellant was advised of his constitutional rights. These rights are commonly referred to as the ‘Miranda’ rights and were in compliance with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). There was testimony that both the rights and the waiver of rights form were read to the appellant; that the appellant read them both and that he stated he understood them.
“We are of the opinion that the confession of the appellant was freely and voluntarily given. The issue raised by the appellant has previously been answered by the Alabama Supreme Court in Elrod v. State, 281 Ala. 331, 202 So.2d 539 (1967). While the accused’s intelligence, character, and situation at the time of the confession are important considerations in determining whether that confession was voluntary, the fact that the accused was of tender age or weak intellect will not alone render the confession inadmissible in evidence as involuntary, Elrod, supra; or where the accused was of weak mentality, feeble-minded, under mental stress or an illiterate, Elrod, supra; or was not in full possession of his mental faculties; Lokos v. State, 278 Ala. 586, 179 So.2d 714, vacated in 408 U.S. 935, 92 S.Ct. 2854, 33 L.Ed.2d 749, on remand, 290 Ala. 122, 274 So.2d 303 (1965); or that the accused was an ‘ignorant’ man, Porter v. State, 55 Ala. 95 (1876).
“A confession of crime is not inadmissible merely because the accused, who was not insane, was of less than normal intelligence. Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246, rehearing denied, 352 U.S. 1019, 77 S.Ct. 553, 1 L.Ed.2d 561 (1957) (accused left school at age 16 while still in the third grade; his mother testified that he had always been ‘thickheaded’; the court commented that he was ‘certainly of low mentality, if not mentally ill’); Hoober v. State, 81 Ala. 51, 1 So. 574 (1886) (accused was a person of ‘weak mental capacity’); Peck v. State, 147 Ala. 100, 41 So. 759 (1906) (a ‘weak-minded’ person). Generally, see Annotation: mental subnormality of accused as affecting voluntariness or admissibility of confession. 69 A.L.R.2d 348. Thus while the fact that a confession was made by an illiterate or one with below normal intelligence is to be taken into consideration and viewed as a factor indicating that the confession was lacking in volun-tariness, a confession is not inadmissible merely because the accused was of less than normal intelligence.”
There was ample testimony that the waiver of rights form was read to appellant and he stated that he understood his rights. He signed the waiver of rights form. Under Arnold, supra, and the cases cited therein, a sufficient showing of voluntariness was made notwithstanding appellant’s alleged illiteracy. Appellant also raises the issue of whether his inculpatory statement was the result of being threatened with the death penalty if he did not sign the confes-sory statement. Appellant’s claims are in conflict with the testimony of Officer Gant who stated that he was not threatened or coerced in any manner and no inducements of any kind were made to him in exchange for his statement.
In Botsford v. State, 54 Ala.App. 482, 309 So.2d 835, this court stated the rule to be in the following language:
“The matter of admissibility of a confession in the first instance is addressed to the trial judge. Its weight and credence are addressed to the jury. Edgil v. State, *273 36 Ala.App. 379, 56 So.2d 677; Burns v. State, 226 Ala. 117, 145 So. 436.
“Our court recognized in McNair v. State, 50 Ala.App. 465, 280 So.2d 171, that: . . . [I]t is not unusual for the voluntariness inquiry to present conflicting evidence. Edgil v. State, 36 Ala.App. 379, 56 So.2d 677. When such a conflict occurs and the trial judge finds that the confession was voluntarily made, great weight must be given to his judgment. This finding will not be disturbed on appeal unless the appellate court is convinced that the conclusion is palpably contrary to the weight of the evidence. Emerson v. State, [281 Ala. 29, 198 So.2d 613] supra; Harris v. State, 280 Ala. 468, 195 So.2d 521; Edgil v. State, supra. Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence arid not to a moral certainty. Minirth v. State, 40 Ala.App. 527, 117 So.2d 355, cert. denied, 270 Ala. 228, 117 So.2d 360.’
“Attorneys for appellant cross-examined the officers on voir dire out of the jury’s presence, and in court with the jury present, on all the questions pertaining to voluntariness, including the Miranda warnings and waiver of counsel. The appellant testified on voir dire, out of the presence of the jury, that he had been coerced, threatened, intimidated, and denied the right to counsel. He testified before the jury, by stipulation, for the same limited purpose. We believe that the testimony was sufficient for the trial court to make its initial finding that the confession was voluntary. This controversy was ultimately resolved by the jury in favor of the state, and under the foregoing facts, we are not persuaded that the verdict should be disturbed.”
There was more than sufficient evidence to support the ruling of the trial court that the confessory statement was not the product of any threat made against appellant. The voluntariness of an inculpa-tory statement is a question of law for the court and a finding that such statement was voluntary will not be disturbed on appeal unless it appears contrary to the great weight of the evidence or is manifestly wrong. Balentine v. State, Ala.Cr.App., 339 So.2d 1063; Stewart v. State, 49 Ala.App. 681, 275 So.2d 360. The trial court did not err in admitting the confession into evidence.
Next, appellant contends that the chain of custody of the death weapon was not sufficiently connected to authorize its admission into evidence. Admittedly, there was a conflict in the testimony of Officer Todd and Robert Johnson, Supervisor of the Crime Laboratory, as to the metal pipe found near the body of the victim. Todd stated that he placed the pipe on Johnson’s desk and it was not sealed in a container. Johnson testified that the pipe was sealed in a package and attached to it was a receipt slip from Officer Todd stating that he put it on his desk on November 19,1977. Johnson stated that the pipe was in the same condition at the time he carried it to the Toxicology Department as it was when he first received it. More importantly Officer Todd positively identified the pipe as the one he found near the body of the deceased and that it was in the same condition that it was in when he picked it up at the scene of the murder.
The evidence as to the custody and possession of the metal pipe unequivocally shows there was no missing link in the chain of identification.
In Dennison v. State, 259 Ala. 424, 66 So.2d 552, the Supreme Court said:
“. . . The preliminary proof identifying and describing the considered articles fully complied with the rule and under no sort of theory would the trial court have been warranted in refusing their admission.”
In Henry v. State, 57 Ala.App. 383, 328 So.2d 634, this court treated a fact situation markedly similar with regard to the issue of access to the evidence by other persons who had keys to the crime laboratory. A crimi *274 nologist testified that other members of his office had keys to the cabinet in which the evidence had been placed. The court held the evidence was properly admitted into evidence, saying,
“We believe that the chain of custody was sufficient to establish a jury question as to the accuracy of the exhibit’s identification. Green v. State, 42 Ala.App. 439, 167 So.2d 694.
“Nothing was shown that indicated the continuity of possession had been disturbed. Under these facts, ample assurance of the exhibit’s authenticity . was shown.”
The basic and controlling reason for establishing the identification and continuity of possession of an article offered into evidence is to show that no unauthorized person has tampered with the article. Both the testimony of Officer Todd and Robert Johnson gave that precise assurance.
Finally, appellant claims he was denied his constitutional right to a speedy trial. We do not agree.
It is settled law that speedy trial rights do not operate to deprive the state of a reasonable opportunity to prosecute defendants. A defendant cannot claim his constitutional rights have been denied where the delay is caused by him, or where delays are made necessary by the law itself, or occasioned by want of time to try the case. Cook v. State, Ala.Cr.App., 333 So.2d 855; certiorari denied, 333 So.2d 858.
In the present case the interval between indictment and the date of trial was less than six months, and appellant filed a motion to dismiss less than four months after indictment in December 1978. Appellant claims that there was a lapse of thirteen months between the date of his arrest and the date of trial. During this period of time appellant obtained one continuance and another continuance was due to the illness of the prosecutor. Another delay was due to the necessity to reindict appellant in order to avoid a fatal variance between the indictment and the proof to be offered in support thereof. Appellant filed a motion to dismiss which caused another delay while the motion was being considered.
In Broadnax v. State, 54 Ala.App. 546, 310 So.2d 265, this court held that a delay of approximately 17 months between the initial indictment and trial did not deny defendant his right to a speedy trial.
In Giles v. State, 52 Ala.App. 106, 289 So.2d 673, this court held that a delay of 12 months was not sufficient to show a denial of the right to a speedy trial absent a showing of prejudice to the accused.
In Gilbreath v. State, 54 Ala.App. 676, 312 So.2d 81, it was held that a delay of slightly over eight months was not too long where there was no evidence of prejudice to the defendant.
Appellant did not testify on the trial in chief nor did he offer any evidence in his defense. He did not allege, much less attempt to prove, that he was prejudiced in any manner by the delay in bringing his case to trial.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.