HARRIS, Judge.
Appellant was indicted for murder in the first degree. He was convicted of murder in the second degree and the jury fixed his punishment at fifteen years in the penitentiary. He was representéd by retained counsel and at arraignment pleaded not guilty. After sentence was imposed, he gave notice of appeal and requested that the sentence be suspended pending appeal. This request was granted and bond'*was set at $15,000.00.
Appellant was a married man with eight children and he was having a love affair with a married woman who had four children. This affair had been going on for about eighteen months prior to the shooting on the night of October 10, 1974. The shooting occurred in the parking lot behind Gibson’s Department Store in the city of Dothan, Houston County, Alabama, where they often met to engage in illicit intercourse. The woman, Deloris Dozier, stated that she did not consider this liaison with appellant as a “romance” but only a love affair.
Deloris testified that around 6:10 p. m., she parked her car in front of Gibson’s to do some shopping and just happened to run into the deceased, Earlie B. Lawrence, whom she had known for some time as they worked for the same employer. After talking a few minutes they decided to ride around for a while, and Deloris moved her car from the parking space in front of Gibson’s and parked it in the rear where she and appellant had met so many times. She got in the car with the deceased and they rode up the Headland Highway and were gone about two hours. During this trip Deloris said they were discussing personal problems. On the return trip they stopped at a grocery store where she purchased a half gallon of milk.
Prior to October 10, 1974, Deloris’ husband had given her a .38 caliber pistol for her birthday and she obtained a permit to carry the pistol. Appellant also had a pistol and a permit to carry it. Each of them knew about the pistols and the permits and that both carried their pistols with them.
*908 When Deloris and the deceased returned to the rear parking lot at Gibson’s, they did not see another vehicle anywhere around Deloris’ car and the deceased parked his automobile next to her car. She got out of the deceased’s car and started to get in her car. She had her purse and the half gallon of milk in her hands. From this point on the evidence is in sharp conflict. According to the testimony of Deloris, “Just as I put my foot on the ground the back door of my car came open and Willie Arthur Parks was getting out of the back seat of my car,” and he said, “I told you if I was to catch you with someone else I was going to kill you.”
Deloris further testified that she reached for him and had him up around his neck and they were tussling and she ran to the front of her car and tried to get her pistol out of her purse; that appellant started after her and she got her pistol out of her purse. At this point the deceased was getting out of his car and was trying to say something to appellant and appellant turned toward the deceased and she heard gunshots. She started back around her car and when she passed the deceased, he was leaning over and groaning and she heard another shot and felt pain in her back. She turned and fired at appellant and he ran and fell. She stated that she fired at appellant twice, but she didn’t know in what direction the bullets went. She further stated that she fell and appellant ran from the scene but a few minutes later he drove his car back to the scene of the shooting and looked at her and the deceased on the ground and backed his car up and left them lying on the ground.
Deloris stated that appellant told her he would rather see her dead than have somebody else have her. She said he was the only man she was going with during this eighteen months.
Appellant’s version of the occurrence was entirely different from the testimony of Deloris. He testified that he did not know the deceased in his lifetime. He stated that he got off work at 6:00 p. m. saying that he had to go to get some crayons for his little girls. That he went to Gibson’s and when he came out, he walked to the back and saw Mrs. Dozier’s car parked there and that all the doors were locked except the back left door and he got in the back seat and went to sleep and that when he woke up, Deloris knocked him back against the car and started digging in her pocketbook and he ran around the car and came around the car and that was the first time she saw him and he then snatched the gun and shot at her. That Deloris pulled the deceased over in front of her and he went over to another position and tried to shoot her. He said he did not know how many times he shot his pistol and that both Deloris and the deceased were standing up when he ran from the scene. He denied getting in his car and returning to the place of the shooting. He further testified that he was not mad with anybody when he got in the back seat of Deloris’ car. He was expecting to see her when she came back but stated, “I didn’t expect her to be with someone.” He said when he left the scene of the shooting, he threw his pistol in a creek. The officers were unable to find the pistol.
He testified further that he had been going with Deloris since the night of the shooting and that he had sexual relations with her seventeen or eighteen times and this started two weeks after he got out of jail.
On cross-examination he testified that he left work at 6:00 p. m. because he was sick. That he got dizzy and had pain in his side but he didn’t go home. That he parked his car where it could not be seen from where Deloris’ car was parked. He said he had never threatened her but she told him she would have shot him but she was afraid that if she missed him, he would shoot her. He stated that she bit him one time and he cut her with a knife. He stated she started shooting first and he never got hit one time.
*909 He further testified that the deceased was just standing by the side of his car when the shooting started and that Deloris grabbed the deceased and pushed him in front of her and used him as a shield. That he moved over and kept shooting because she kept shooting.
On re-direct examination he testified he was in her car because he wanted to see her.
From the record:
“Q And you were there because you wanted to see her?
“A That’s right. She had some pictures and she said her husband had gotten one of those pictures and carried it somewhere and I wanted the rest of them. When I saw her car, I was waiting for her. She said that she was going to get the pictures. That is the reason I waited for her.
“Q But you expected to see her otherwise too?
“A Yes, sir.”
Lee Norris Jackson testified that he was self-employed in the janitorial business and performed this service for many buildings in Dothan. That he was at the Plaza II Office and shopping complex on October 10, 1974 from 5 o’clock until 8:30 and he heard gunshots in the vicinity of the Headhunter’s Beauty Shop, which was about three doors away from the General Telephone building. He looked in that direction and saw a person running. About a minute later he saw a car come around the corner with the headlights flashing on him and the car backed up and left the scene. He stated the car was a blue Nova and he knew that appellant owned a blue Nova. He further testified that he knew appellant and Mrs. Dozier and had seen them together many times in the rear parking lot of Gibson’s prior to October 10, 1974. He stated he heard about five gunshots and then one or two more.
James Brackin, a Police Officer of the City of Dothan, testified that on the night of October 10, 1974, he got a call to go to Plaza II and when he arrived, he saw two persons, one male and one female, lying on the ground. He said the man was lying next to a car with his feet towards the vehicle and the woman was lying with her head towards the back of the car. He stated there was a gun beside the woman and it was lying adjacent to her left hand. He further testified he retracted a bullet from a block wall nearby, but he did not know the caliber. He did not examine the man to see if he had a weapon but he did not see a weapon near him. He tried to talk to the man but he was delirious and he did not receive any intelligent information.
Marlin Dillard testified that he was a Lieutenant with the Police Department and that at about 10:15 on the night of October 10, 1974, appellant came to the police station and told him his name and asked if the police were looking for him and he was told the police wanted him in connection with a shooting. Appellant said he was ready to give himself up. The officer gave him the Miranda rights and appellant said he understood his rights and signed a waiver of rights form.
Sergeant Larry Lynn of the Dothan Police Department corroborated the testimony of the other officers who went to the scene of the shooting. He stated there was no gun in the vicinity of the deceased and he did not have a weapon on him. He interviewed appellant and took a statement.
The proper predicate was laid as to no threats, promises, rewards or other inducements to get appellant to make a statement.
From the record:
“Q What did he say?
“A I asked him if he had seen Deloris Dozier any where that date and he said yes and I asked him where and he said Gibson’s and I asked him what *910 time and he said about 8:30 or quarter till 9 and I asked him what happened at this time and he said that he had gotten out of the back seat of her car and that she was getting out of this other car and run around the back of the car and got behind the guy that was with her and started shooting and he said that he had his gun in his pocket and I shot back. And I asked him why he got in her car and he said that he was waiting on her and that is where the two of them met a lot of times. I asked him how long he had been going with her and he said right at two years. And I asked him what did he do with the gun and he said that he had thrown it in a creek on Flowers Chapel Road and I asked him why did he run and he said that he didn’t run that he had something to do before he came here. I asked him what was that and he said that he had to go home. I asked him if he knew the man with Deloris and he said no. I asked him if he had ever seen before and he said that not as he recalled. I asked him if he could identify him in any way and he said no. I asked him why did he shoot him and he said that he didn’t, that he was just shooting. I asked him then did he, if anyone else had seen this other than you and he said that he didn’t know. That was the end of the statement.”
An autopsy was performed on the body of the deceased by Dr. James M. Buttram, a State Toxicologist, and he removed four bullets from the body. He stated his education, experience and qualifications and said he had performed between 250 and 300 autopsies. His qualifications were not challenged. He stated that the four entrance wounds were in the chest and stomach area of the body. He also removed a bullet that had entered the back of Deloris Dozier. He sealed each of those bullets in a small manila envelope, put his initials in red ink on the sealing tape and turned them over to Mr. Lamar Miller at the Enterprise Laboratory for delivery to Richard Dale Carter who is a criminalist with the Alabama Department of Toxicology and Criminal Investigation. Dr. Buttram stated the cause of death in the following language:
“Because of the findings on my examination of the body, it is my opinion that death in this case was due to a massive hemorrhage or liver damage and shock as a result of the gunshot wounds, three of which penetrated the liver.”
Mr. Richard Dale Carter testified that he received the sealed envelopes from Lamar Miller with Dr. Buttram’s initials on it and also the initials of the deceased. He stated his education, experience and qualifications in great detail. He further testified that the .32 caliber bullet identified as having been removed from Mrs. Dozier was fired from the same barrel as the four bullets removed from the body of the deceased. He stated further that these .32 caliber bullets that he received and exam-mined could not have been fired from a .38 caliber pistol that was delivered to him by an officer of the Dothan Police Department.
When the State rested, appellant moved to exclude the State’s evidence as to murder in the first degree and murder in the second degree which was overruled. The Court asked appellant’s counsel if he had any more motions and counsel replied that he would not make a motion to exclude the evidence as to manslaughter.
There was no request for the affirmative charge and no exceptions were reserved to the oral charge of the Court. The Court charged the jury on all four degrees of homicide, and the law of self-defense. Appellant’s counsel announced that he was satisfied with the Court’s oral charge.
Appellant filed a motion for a new trial containing nine grounds. The first eight grounds dealt with the sufficiency of the evidence. The ninth ground is as follows:
“(9) The Court erred in that the trial court allowed the jury' to separate at *911 lunch for their midday meal, all to the possible prejudice of the defendant.”
This motion was set for hearing- and the Court made and entered the following judgment or order:
“JUDGMENT ON MOTION FOR NEW TRIAL
“The matter before the Court is the Defendant’s motion for a new trial which was heard orally by the Court this day. The only grounds of any substance, in the opinion of the Court, in the said motion is Grounds 9 which alleges that the Court erred in allowing ‘the jury to separate at lunch for their midday meal, all to the possible prejudice of the Defendant.’ At the hearing on the motion for a new trial the Court questioned Defendant’s Attorney about this allegation and made the statement that the Court distinctly remembered getting permission from the Defendant, the Defendant’s counsel and the prosecuting attorney, out of the presence and hearing of the jury, for the jury to separate during the noon hour on the day of Defendant’s trial. The Court was mistaken. Immediately after the hearing on the motion for a new trial, the Court had the Court Reporter bring his notes from Defendant’s trial into the Courtroom and read to the Court what transpired concerning the jury and whether or not they separated for lunch during Defendant’s trial. The Court Reporter’s notes reveal that the jury did not separate for lunch during Defendant’s trial. The Court Reporter’s notes reveal that they were sent to lunch in a body in the care of the bailiffs, Mrs. Lucy Nelson and Mr. Charlie Boyette; that they were instructed not to talk about the case among themselves or to anyone else; that they were instructed to leave the courtroom in a body, to go to lunch in a body and to return to the courtroom after lunch in a body. In light of this, the Court finds that Grounds 9 of defendant’s motion for new trial is not true and that said motion should be denied. It is therefore,
ORDERED, ADJUDGED AND DECREED by the Court that Defendant’s Motion for a New Trial be, and the same hereby is, denied. The Clerk is directed to furnish a copy of this judgment to Honorable Jack W. Smith, Attorney for Defendant, and the District Attorney of the 20th Judicial Circuit of Alabama.
THIS the 18th day of April, 1975.
S/Jerry M. White
Judge, 20th Judicial Circuit of Alabama.”
Murder in the second degree is the unlawful killing of a human being with malice, but without deliberation or premeditation, and the defendant’s use of a pistol was sufficient to warrant the jury in finding that he acted with malice. Holcey v. State, 52 Ala.App. 664, 296 So.2d 750.
In Miller v. State, 38 Ala.App. 593, 90 So.2d 166, this Court held:
“ ‘Legal Malice’ as an ingredient of murder is an intent to take human life without legal excuse, justification or mitigation, and it may be presumed from the use of a deadly weapon, unless the evidence which proves the killing rebuts the presumption.”
The conflict in the evidence presented a question for the jury to determine, and the evidence was sufficient, if believed by the jury to the required degree, to support the verdict. Young v. State, 283 Ala. 676, 220 So.2d 843; Harris v. State, 48 Ala.App. 723, 267 So.2d 512; Brand v. State, 46 Ala.App. 41, 237 So.2d 524; Pugh v. State, 51 Ala.App. 164, 283 So.2d 616.
Decision on motion for a new trial rests largely within the sound discretion of the trial court and, in reviewing that decision this Court will indulge every presumption in favor of the correctness thereof. Moore v. State, 52 Ala.App. 179, *912 290 So.2d 246; Johnson v. State, 51 Ala.App. 172, 283 So.2d 624; Hamm v. State, 38 Ala.App. 423, 87 So.2d 863.
We have carefully searched the record for errors injuriously affecting'the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
TYSON, DeCARLO and BOOKOUT, JJ., concur.