HARRIS, Presiding Judge.
Appellant was convicted of murder in the second degree and the jury fixed his punishment at twenty-five years in the penitentiary. He was represented by retained counsel and at arraignment pleaded not guilty. After sentence was imposed he gave notice of appeal and petitioned for a free transcript. He was furnished a free transcript and trial counsel was appointed to represent him on this appeal.
This case arose from an incident which occurred in the Northside Pool Hall in Gadsden, Alabama on July 12, 1977. The evidence is undisputed that on that date, appellant shot and killed Lawrence Bradford in the Northside Pool Hall. Appellant contends, however, the shooting was in self-defense.
Dr. William S. Warren testified that, on August 5, 1977, he examined the body of Lawrence Bradford. In his opinion, the cause of death was a gunshot wound to the brain. The entrance of the bullet was at the rear of the skull on the right side. The deceased was first examined by Warren on July 12, 1977. Bradford died on August 5, 1977. A death certificate signed by Warren, stating that Bradford’s cause of death was a gunshot wound to “both cerebral hemispheres,” was admitted into evidence without objection.
Daniel M. Avery, employed by the State Department of Toxicology and Criminal Investigation, testified that he conducted an autopsy on the body of Lawrence Bradford on August 8, 1977. Avery recovered a projectile from the left mid-portion of the brain. The entrance of the bullet was made in the right rear portion of the deceased’s skull. Avery attributed Bradford’s death to bronchopneumonia resulting from the gunshot wound. Avery marked this bullet for identification and turned it over to Ralph Phillips, a field agent for the Department of Toxicology.
John M. Case, employed by the Department of Toxicology, testified that he received a .22 caliber pistol and a spent projectile from Ralph Williams on August 9, 1977. Following test firings, Case formed the opinion that the spent projectile was similar to test rounds fired from the pistol. However, a definite conclusion could not be reached because of the damaged condition of the “evidence bullet.” The pistol and spent projectile were admitted into evidence without objection.
Jimmy Sumpter testified that he worked at the American Sportsman Center, a poolroom on Tuscaloosa Street in Etowah County. Sumpter saw appellant in the poolroom on July 12,1977. While appellant was playing cards, deceased walked in. Appellant asked him, “Man, you want to pay my dollar?” Then the deceased replied, “I’m not going to pay you no dollar.” Appellant, Sumpter testified, then left, only to return about five minutes later to ask the deceased for the dollar again. When the deceased repeated he would not, appellant walked up behind him and shot him. The deceased was counting his money at the time. Sumpter testified the deceased had no weapon. On cross-examination, the witness testified that the deceased carried a .357 magnum pistol. Sumpter testified that the deceased was “pretty violent, but not that bad.”
Mark Worthy testified to substantially the same events as Sumpter. He added that when appellant returned to the poolroom after asking the deceased for the dollar that he saw appellant place the gun, in evidence, in a front trousers pocket. Worthy saw appellant place the gun to the deceased’s head and shoot him. The deceased had some money in his hand at the *518 time. Worthy did not see the deceased with a gun that day; however, he had seen deceased carry a .357 magnum pistol. The deceased wore this pistol in a shoulder holster or stuck in his belt on the left side. Worthy testified that, after he was shot, the deceased said “something about his gun.” Worthy did not see the weapon, however.
Lieutenant Morris Alexander of the Gadsden Police Department testified that he investigated a shooting at the Sportsman Center Pool Hall on July 12, 1977. He did not find any weapon on Bradford’s person. Alexander subsequently arrested appellant and advised him of his “Miranda Rights,” after which appellant signed a waiver form. At that point, appellant dictated a statement to Alexander. This statement was admitted into evidence and is set out below verbatim, and the typographical and grammatical errors in the original are not corrected.
“Today about 11:00 o’clock I picked Pete Sumpter up and carried him to the Northside Pool Room where he works, after we got there Mitchell Worthy come up and ask me to carry him to Bonanza Sirloin Pit where he works and Pete rode with me down there, then we went back to the pool room and I sit around there and played Trey low cards about 3:30 I left the pool room and went to see a guy who plays Piano in my band but he was not at home so I went back to the pool room when I went in they had broke up the card game And I walked around the Table and Lawrence Bradford was sitting on the table counting his money and I ask him when are you going to give me the Dollar that you owe me and Lawrence turned around and said I aint going to give you a goddam thing and steped down as he steped down he reach like he was going to reach under his shirt and I stepped to my right and pulled my gun and shot one time, them I walked around him and pointed the gun at him and he didnt move and I went to the doorv and pete was the last one out of the pool room and he sais dont shoot him anymore and I said I am not but if he moves Ill blow his brains out but he Quit moving so I put my gun up and said to call the Police, Then I left and went out by the Agricola shopping canter where my sister works and told her what had happened I left there and went to the county courthouse where I give myself up, And they called the police. This statement is true and correct to the best of my knoeledge and was typed for me by Lt M. L. Alexander after he explained my rights to me.”
This statement was signed by appellant. Alexander witnessed appellant’s signature. Appellant cooperated with Alexander, “one hundred percent.”
Eunice Bradford testified that she was the widow of the deceased. On July 12, 1977, Mrs. Bradford testified, the deceased’s .357 magnum was under the mattress of their bed at home.
At this time the State rested and appellant made the following motion, which was denied:
“Mr. Bone: At this time, if the Court please, we move to exclude the evidence and discharge the Defendant.
“The Court: Motion overruled.”
Appellant testified that the deceased carried a .357 magnum pistol on his person every day. This weapon was carried concealed under the deceased’s shirt. Appellant testified that he had a .22 caliber pistol on the day of the fatal incident to sell in order to pay back a loan.
Following is appellant’s version of the events in the poolroom.
From the record:
“Q. Did Pete say anything then?
“A. Well, Pete — Pete said, said, ‘He just lost $100 in a dice game.’ Said, ‘Man, Squeaky just lost $100 in a dice game.’ Like that, you know, so, well, I knew him — I knew what kind of person he was and so I—
“Q. Who are you talking about now, Pete or Squeaky?
“A. Squeaky. And I knew he was, you know, upset, you know, because of that and I just — I stepped back then, you *519 know, because he said that, you know, that he had just lost his $100 and so, then Squeaky jumped up from 'the table, you know, kicked his foot down and jumped up from the table like that toward me, turned toward me, facing me, and said, ‘Nigger, I’m not going to give you a God damn thing like that.’ And I was backing away from him. He was saying something else, you know. What caught my attention was that Squeaky was run his hand in his shirt like that.
“Q. Did you say anything to him?
“A. Well, I said — I said, ‘Don’t.’ Like that, because I knew what he was doing, you know, because when he was sitting on the table like that you could see the handle of the gun up under his shirt, you know, and so, I said — I said, ‘Squeaky, don’t.’ You know, ‘Don’t.’ Like that, and just started backing away from him and I thought about the gun that I had. I reached in and someway got it and got it out. Well, I wasn’t accustomed to having it and so I don’t know quite what he made me think about the gun I had, but I grabbed the gun out and well, I was — I come up like this. I just figured, you know, he kill me anyway, you know, just like that, because I knew what kind of gun it was and I knew what it would do to a person, and I just figured, you know, well, when I heard the shot, well, I didn’t know really whether it was his gun or my gun that went off, you know, just like that. (Indicating)”
Appellant testified that he did not intend to kill Bradford. Appellant insisted that he told Alexander that he saw the deceased’s gun, although that was not in the statement which he signed. On cross-examination, appellant testified that he had been convicted of grand larceny.
Booker T. Lee testified that appellant’s general reputation and reputation for peace and quiet were good. He also testified that appellant’s reputation for truth and veracity was good and that he would believe appellant under oath.
Oliver Bond testified that appellant’s reputation for truth and veracity was good.
Allen Stanford testified that appellant’s reputation for truth and veracity was good.
In rebuttal, Ralph Machen testified that the deceased’s general reputation was good.
James Kelton testified that the deceased’s general reputation and reputation for peace and quiet were good.
Joe Howard and Larry Johnson testified that the general reputation of the deceased for peace and quiet was good.
Vanderbilt Hoyt in rebuttal for the defense testified that the deceased had fired a shotgun at his home while he and his children were there.
Murder in the second degree is the unlawful killing of a human being with malice, but without deliberation or premeditation. Parks v. State, Ala.Cr.App., 333 So.2d 906. The evidence in this case was sufficient to support appellant’s conviction despite appellant’s contention that the shooting was in self-defense. Conflicting evidence is always a question for the jury to determine. Pike v. State, Ala.Cr.App., 340 So.2d 865; Lee v. State, Ala.Cr.App., 346 So.2d 31.
Appellant contends that the State never established that the homicide occurred in Etowah County. He urges that this matter of venue was raised in the trial court by his motion to exclude the State’s evidence.
It is well established that the issue of venue is not preserved where the motion to exclude is couched in general terms and fails to specifically refer to the sufficiency of the evidence to prove venue. Hunt v. State, Ala.Cr.App., 331 So.2d 834. This issue may not be raised for the first time on appeal. Daly v. State, 47 Ala.App. 681, 260 So.2d 412; Hunt, supra; Eagen v. State, 280 Ala. 438, 194 So.2d 842; Richardson v. State, 39 Ala.App. 207, 98 So.2d 59.
Two eyewitnesses to the shooting, Jimmy Sumpter and Mark Worthy, both testified that they were at this, particular pool hall on Tuscaloosa Street when the shooting occurred. Sumpter’s testimony specifically mentioned Etowah County.
*520 From the record:
“Q. Please state your name to the Court and jury.
“A. Jimmy Sumpter.
“Q. Where do you live?
“A. 1220 Brookside Drive.
“Q. How old are you?
“The Court: Speak up so they can hear.
“A. Twenty-six.
“Q. Where do you work?
“A. Down poolroom on Tuscaloosa.
“Q. What poolroom?
“A. American Sportsman Center.
“Q. Do they have a name for it?
“A. Yeah.
“Q. The poolroom?
“A. Yeah.
“Q. What’s the name?
“A. American Sportsman Center.
“Q. Sportsman Club?
“A. Center.
“Q. Beg your pardon?
“A. Center.
“Q. Center?
“A. Yeah.
“Q. Sportsman Center?
“A. Yeah.
“Q. I see. And is that at 1010 Tuscaloosa?
“A. Yes.
“Q. Here in Etowah County?
“A. Yeah.
“Q. Mr. Sumpter, how long have you worked there at the poolroom?
“A. About two years, I think.
“Q. Two years?
“A. (Witness nods head in the affirmative)
“Q. And were you working there on the date of July the 12th on a Tuesday of this year, back this past summer?
“A. Yes.
“Q. And did you have occasion to see Alonzo Posey, the Defendant, in this poolroom?
“A. Yes.”
Mark Worthy testified that he was present in this same pool hall and saw appellant shoot the deceased in the back of the head.
Morris Alexander, a Lieutenant of Detectives of the City of Gadsden, testified that he made an investigation of the shooting at the Sportsman Center Pool Hall on July 12, 1977. He stated, “When I arrived at the scene I found Lawrence Bradford laying on the floor of the pool hall and he stated that he had been shot.”
He further testified that he did not find a weapon of any kind on the person of Lawrence. Bradford. He was asked who was present when he arrived and replied, “Jimmy Sumpter was present, the only one I know by that name. There were some more people, but I don’t know their names.”
Venue may be established by circumstantial evidence. In Willcutt v. State, 284 Ala. 547, 226 So.2d 328, the rule is stated as follows:
“While proof of venue is essential to a conviction, it, like any other fact in the case, may be established by circumstantial evidence; and when the State offers evidence tending to show that the crime was committed within the jurisdiction of the court, the question becomes one for the jury. Denton v. State, 263 Ala. 311, 82 So.2d 406.”
State’s Exhibit 1, “Verification of Death Record,” clearly shows that the homicide occurred in Etowah County, Alabama.
A careful search of the record fails to reveal any error injuriously affecting the substantial rights of appellant, and the judgment of conviction is due to be affirmed.
AFFIRMED.
All the Judges concur.