Appellant was put to trial upon an indictment charging him with murder in the first degree. The jury returned a verdict of manslaughter in the first degree and fixed his punishment at four years in the penitentiary. He was sentenced accordingly.
Appellant was represented by counsel of his choice and at arraignment pleaded not guilty and not guilty by reason of insanity. At the conclusion of the testimony, appellant withdrew his special plea of not guilty by reason of insanity.
When the State rested its case, appellant made a motion to exclude the State's evidence for failure to make out a prima facie case. He also requested the affirmative charge on the four degrees of homicide embraced in the indictment. A motion for a new trial was filed in which, among other issues, the sufficiency of the evidence was raised. This puts us to a recital of the evidence.
In the early morning hours of April 13, 1979, the deceased, Sadie Thomas, was shot and killed in her home in Parrish, Walker County, Alabama. The evidence is not disputed that the deceased was shot with a .38 caliber pistol in the hands of appellant. Appellant claimed the shooting was accidental.
Mary Nash, the mother of the deceased, testified that she received a telephone call from appellant at 4:00 a.m. on April 13, 1979, and recognized his voice. The call awakened her and when she answered the telephone appellant said, "This is John Hewitt. I just shot your daughter." Mary Nash replied, "No, you ain't shot my daughter. If you is, you must be crazy." Appellant said, "No, I'm not crazy. I just done shot your daughter. You better get down here before she bleeds to death." Mary Nash lived about ten blocks from her daughter and she started walking to her house. She stopped on the way and got Wayne Thomas, the fourteen or fifteen year old brother of the deceased.
When they got to the home of the deceased, they found the door locked and the boy kicked it down. They entered the house and found it was filled with smoke, which came from the kitchen where the deceased had been cooking fish, butter beans and making coffee. The lights were on but appellant was not present. Mary Nash removed everything from the stove and went into the living room and found her daughter on the floor. She felt for a pulse in her daughter's arm and neck but could not find one. She told Wayne Thomas his sister was dead. She then call the Parrish Police Department and an officer arrived shortly. She further testified that her daughter worked at Marshall Durbin Processing Plant and for a Mrs. Pribbenow, and she had to be at work at the processing plant at a quarter to six. *Page 160 
On cross-examination this witness testified that the deceased and appellant had been going together for about six or seven months prior to her death, that the deceased and appellant lived in separate houses, and that she lived about half way between them. She said the Parrish police were the first officers to arrive at the scene of the shooting, and that appellant and her husband, Robert Nash, came to the house. Appellant came in the house, but Robert Nash did not. She further stated that, when appellant called her that morning at 4:00 a.m. to tell her about the shooting, he told her it was an accident. In her words, "Yes, he said it was an accident. He shore said it."
On re-direct Mary Nash stated that the house was locked when they arrived and appellant was not there, but came up with her husband, Robert Nash, who lives with her, and they were both at home when appellant called her. She said her daughter had a car with a brand new motor in it and it was in good running shape. She also stated that her daughter was a small woman.
Mr. John Vaughn, an investigator with the District Attorney's office in Walker County for two years, was called to testify out of the presence and hearing of the jury. He stated that he had been in law enforcement for seven years and he investigated the death of Sadie Thomas in the early morning hours of April 13, 1979. He arrived at the scene of the shooting at approximately 5:45 a.m., and there were officers already at the scene. These included a Parrish police officer and two Walker County sheriff's deputies. They were in the process of clearing the scene, and he observed a black female, identified as Sadie Thomas, lying on the living room floor. He stated he had appellant removed from the room where the deceased was lying and placed in a bedroom in the house so that he could photograph the crime scene before anything was disturbed. He made photographs of the entire house, including the body of Sadie Thomas. He then went to the funeral home and made photographs of the unclothed body of the deceased, showing particularly the entrance wound in the chest. While at the funeral home, Mr. Vaughn picked up the blouse deceased was wearing at the time she was shot.
State's Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17 and 18 were identified and introduced into evidence. Most of these exhibits were introduced into evidence without objection. As to State's Exhibit 1, counsel for appellant asked the witness on voir dire about a black mark on the photograph, and the witness explained the mark was made by a black ballpoint pen which pointed to the wound in the center of the chest. Appellant's counsel objected to State's Exhibit 4 on the ground that photograph showed blood and would tend to inflame the minds of the jury. The objection was overruled. Appellant's counsel objected to a drawing made by Mr. Vaughn of the bathroom in the house of the deceased, but when the witness explained the exhibit was drawn to scale, i.e., three inches equaled one foot, the exhibit went into evidence without objection.
Mr. Vaughn further testified that he found a .38 caliber pistol on the couch in the living room of the home of the deceased, dusted it for fingerprints and marked the cartridges as to their corresponding chamber. The pistol would hold six bullets, and it contained four live rounds and one spent casing and one empty chamber. All of these items were marked with identifying numbers, sealed and sent to the crime laboratory.
Mr. Vaughn stated that he interviewed the defendant at 6:03 a.m. in the bedroom of the home of the deceased where defendant had been placed during the time Mr. Vaughn was taking photographs. Present at the time of the interview was Mr. Paul Kilgore, an investigator with the Walker County Sheriff's Department. Prior to asking appellant any questions, he read him his constitutional rights from a Miranda card and asked him if he understood his rights. Appellant replied that he understood his rights. This witness stated that no one in his presence and hearing made any promises *Page 161 
to appellant, that no hope of reward, remuneration or inducement of any kind was made to or held out to appellant to get him to make a statement. Appellant was not told that it would be better or worse for him if he did or did not make a statement, and appellant was not threatened or coerced in any manner in order to obtain a statement from him. Mr. Vaughn was asked to read to the court the constitutional rights of which he advised appellant from the card, and he complied by reading:
 "The Miranda Warning. 1. You have the right to remain silent. 2. Anything you say can and will be used against you in a court of law. 3. You have the right to talk to a lawyer and have him present with you while you are being questioned. 4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. 5. You can decide at any time to exercise these rights and not answer any questions or make any statements. Upon advising Mr. Hewitt of his rights I asked: Do you understand each of these rights I have explained to you?
"Q. What if anything did he say when you said that?
"A. He said, `Yes.'
"Q. Did you say anything else to him?
 "A. Yes, sir. I repeated by saying, `Having these rights in mind, do you wish to talk to me now?' Again he said, `Yes.'
At this point appellant's counsel questioned the witness on voir dire.
 "Q. (Mr. Selman) Mr. Vaughn, what time of day was it that you talked to John Hewitt on this occasion you are about to testify about?
 "A. Mr. Hewitt was interviewed, I noted at the time I was advising him of his rights, that the time was 6:03 a.m. on April 13, 1979.
"Q. Did you make a written statement of that?
 "A. No, sir, I did not make a written statement of what Mr. Hewitt told me, in the fact that he signed it. The statement he made to me was oral. These notes were then placed in my case report.
"Q. And, you say who else was present?
 "A. Investigator Paul Kilgore, Walker County Sheriff's Department.
"Q. And, this was about what time?
"A. 6:03 a.m.
 "Q. Now, you had arrived down there at Sadie Thomas' house about what time?
"A. Approximately 5:45 a.m.
 "Q. Had you learned in the course of your investigation about what time the shooting occurred?
 "A. No, sir, I had not up until that point been given any information as to when the actual incident had occurred.
"Q. This was about 6:03 a.m.?
"A. Yes, sir.
 "Q. I will ask you if John Hewitt here didn't appear in a rather dazed and slow and awkward and fumbly fashion when you talked with him?
 "A. No, sir, he did not. He appeared very quiet and very reserved. This was my impression.
"Q. That was your impression?
"A. Yes, sir.
"Q. Had you ever known John Hewitt before that?
"A. No, sir, I had never met him before.
"Q. Had you ever seen him before?
"A. No, sir.
 "Q. But, it was obvious to you that the shooting had not occurred more than an hour or two hours before you were asking him the questions?
 "A. No, sir. At this point in the investigation I could not determine or have any type determination as to the time the actual incident had occurred.
 "Q. But, you have been in law enforcement for seven years, right?
"A. Yes, sir.
 "Q. And, was the body still there on the floor at that time?
"A. Yes, sir, it was.
"Q. And, this was how long after you got there?
 "A. It was upon my arrival at 5:45 and I interviewed him at 6:03. We are talking about in the neighborhood of eighteen to twenty minutes. *Page 162 
 "Q. And Mr. Harris, Chief of Police of Parrish was there, wasn't he?
"A. Yes, sir, he was.
"Q. And you had asked some questions around?
"A. Yes, sir.
 "Q. And, you tell this jury that you did not have any idea at that time when this shooting approximately occurred?
"A. No, sir, I had not at that time.
 "Q. But you could tell in your best judgment based on your experience it had not been more than an hour or two hours.
"A. No, sir, I couldn't tell at that point.
 "MR. BAKER: If it please the Court, this would be ample time on cross-examination.
"COURT: Voir dire. Go ahead.
"Q. You say he appeared to be slow and deliberate.
"A. No, sir, I said he was quiet and reserved.
"Q. Did he appear to be somewhat in a daze?
"A. No, sir, he did not.
"Q. Well, you said you had never seen him before?
"A. No, sir.
 "Q. And, he told you he understood his Miranda rights?
"A. Yes, sir.
"Q. Did he use the expression Miranda?
 "A. No, sir, he didn't say Miranda rights. When I asked him if he understood his rights the answer was `Yes.'
 "Q. Did you read them as fast to him as you have to us and the jury?
"A. I doubt I did.
"Q. Who do you say was present with you?
"A. Investigator Kilgore."
At the conclusion of the voir dire examination, as quoted above, appellant's counsel objected to Mr. Vaughn's testifying as to any statement made by appellant on the grounds that the shooting had occurred less than two hours before and that the defendant would naturally have been in a state of shock. He would have been confused, and his statements would not likely have been rational and it would have been difficult for him to understand anything at all. The objection was overruled.
According to Mr. Vaughn, appellant's statement to him was oral, and is as follows:
 "When I asked Mr. Hewitt if he could tell me what happened, Mr. Hewitt told me he had gone to Ms. Thomas' house at around 4:00 the same morning which would have been April 13, 1979. He said that upon entering the house that he and Ms. Thomas had apparently gotten into a struggle of some type and argument. During the course of this argument Mr. Hewitt told me they began fighting over his gun. That both of them were fighting over the gun and that the gun discharged. Ms. Thomas was in turn hit in the chest and she fell."
Back before the jury, Mr. Vaughn continued his testimony. He was shown State's Exhibit 5 and explained that this photograph was taken from the front porch of Ms. Thomas' residence, looking through a broken window on the storm door. He stated he unloaded the .38 caliber pistol he found on the couch in the home of the deceased. He said the pistol had four live and one spent cartridge and one chamber was empty. He was asked to go to the board and make a chart of the pistol and explain its function to the jury, and he drew the chart and stated:
 "This would be viewing the cylinder as it were opened up from the rear center . . . In this particular revolver it contained six chambers. This particular revolver is built on a Smith-Wesson patent which means that when the hammer is cocked or the trigger is pulled the cylinder rotates in a counter clockwise direction. When I recovered the revolver from the couch and opened it I noted this particular chamber which was under the hammer contained one spent cartridge. In other words this one had been fired at some time. This one, # 2 was a live round, # 3 contained a live round, 4 a live round, 5 contained a live round, # 6 *Page 163 
was empty and contained no cartridge at all."
From the record:
 "Q. Now, if the trigger, if the .38 were sitting on an empty round and you pulled the trigger what would happen?
 "A. Upon pulling the trigger the cylinder would rotate into a counter clockwise position. Let's assume that the empty chamber was initially under the hammer. As the hammer goes back the cylinder rotates and brings the live round under the chamber at which time the hammer would fall and detonate the primer.
 "Q. All right. If the pistol is setting on empty round and you drop it, is there a bullet in there or projectile to go through it?
"A. No, sir."
On cross-examination this witness testified that he came into possession of a pistol permit issued by the sheriff of Walker County to appellant for the .38 caliber pistol and that appellant also had a pistol permit for a .25 automatic pistol. Both pistol permits were introduced into evidence without objections. It was further developed that appellant's house had been broken into and the .38 caliber pistol was stolen, but was later recovered. It was also shown that, about three weeks prior to the shooting of Sadie Thomas, appellant had accidentally shot himself in the foot.
Mr. Joel Guthrie, an investigator for the Walker County Sheriff's Department, testified that he did not go to the scene of the shooting, but he did have a conversation with appellant in the sheriff's office. This interview occurred around 7:00 a.m. on the day of the shooting in the presence of Investigator Frank Cole. Appellant was again warned of the Miranda rights and the proper predicate was laid, showing that no promises, threats, rewards or other inducements were made to appellant to get him to make a statement. Appellant told Mr. Guthrie that he understood his rights and was willing to give him a statement about the shooting. This witness stated that, to the best of his knowledge, appellant was not in a state of shock and he did not have any trouble understanding what he told him, but that he did talk slowly and haltingly. Mr. Guthrie wrote the statement made by appellant and gave it to him to read. Appellant read the statement for five minutes or longer before he signed it. He started writing the statement around 7:00 a.m. and completed it at about 7:45 a.m. on April 13, 1979. The statement was marked as State's Exhibit 20 and the prosecutor stated he would offer it into evidence later during the trial. When the statement was offered, counsel for appellant objected on specified grounds and the court sustained the objection, but on other grounds.
The prosecutor asked the witness to relate to the jury what appellant told him at that time. Mr. Guthrie then testified over appellant's objections as follows:
 "On the morning I talked with Mr. Hewitt he said he had received a call from Ms. Thomas for him to come down to her home and pick her up and carry her to his house to clean house prior to some of his relatives coming in from Detroit to visit. He said when he arrived at Ms. Thomas' home that she grabbed him by the collar as he came in the door and made some statement about whipping him. At this time Mr. Hewitt said he carried a gun with him, that he always did. This was in the pocket of his overalls and there was a struggle for the gun. He said she was trying to reach for the gun and he in turn was trying to keep her from getting the gun. At this time the gun supposedly fell and went off or went off during the struggle. Ms. Thomas fell against Mr. Hewitt and he said she made some statement about `I'm shot' as best I remember. He laid her down on the floor."
Mr. Guthrie further testified that appellant stated that he called for some help on the telephone and that he picked his gun up from the floor and put it in his pocket. Mr. Guthrie stated that he took a .25 automatic pistol from appellant that same day and talked to him again at 1:00 p.m. in the presence of John Vaughn. Again, it was proved that no promises, threats, rewards, or other inducements were made or held out *Page 164 
to appellant to get him to make a statement. It was stipulated that the Miranda rights and warnings were explained to appellant before he was interrogated on this occasion. The witness stated that he had contacted some members of appellant's family to let them know where appellant was and appellant did not request to see a lawyer, that appellant told him he had carried the pistol with the hammer down on a live round because he had shot some dogs the preceding Friday, that appellant stated he had only one box of ammunition for this .38 pistol and that he had purchased it locally at an unknown period of time before the incident.
On cross-examination Mr. Guthrie stated that appellant said he did not believe the deceased meant him any harm as she grabbed him by the collar, that appellant appeared to be upset during this interview and he never mentioned any fuss between him and the deceased before he went to her home to pick her up and carry her to his house to help clean the house before his relatives were to come for a visit. Mr. Guthrie stated that appellant did not mention to him that he had accidentally shot himself in the foot three weeks before he went to pick up the deceased, nor did he say he had been using crutches during the three weeks prior to April 13, 1979.
On re-direct this witness stated that appellant said that the deceased tried to grab the pistol and was trying to get it out of his pocket, that he was trying to prevent her from getting the pistol, that he had the deceased had been together earlier that night, and that the deceased was drinking. He identified State's Exhibit 22 as the pistol he received from Roland Neal, which was a .25 automatic received from appellant, and State's Exhibit 21 as live rounds of ammunition belonging to appellant. These two exhibits were introduced into evidence without objections. This witness said that appellant told him that, during the apparent struggle for the gun, it fell out of his pocket and hit the floor and went off.
The State called Mr. John R. McDuffie, a criminalist with the Alabama Department of Forensic Sciences with a branch office in Tuscaloosa, Alabama. Mr. McDuffie testified he received a B.S. Degree in Chemistry from Emory University in Atlanta, Georgia, and a Ph. D. in Chemistry from Auburn University in Auburn, Alabama, and had in-service training with the Department since 1972, that since 1976 he had been assigned to the Tuscaloosa laboratory, and that Walker County was one of the counties assigned to the Tuscaloosa area. This witness identified State's Exhibits 23 and 24. These were delivered to the laboratory on April 13, 1979, by Investigator John Vaughn. Number 23 was a blouse worn by the deceased at the time she was shot. The blouse had a hole in the front section just to the right of the midline and a hole in the back of the left sleeve, and two small holes located in the armpit area. He examined the holes in the blouse microscopically and chemically for the presence of gunpowder. He did not find any gunpowder residue on the blouse. The blouse was admitted into evidence without objections. Mr. McDuffie performed a firearms test with State's Exhibit 26 and stated that the evidence cartridge was fired in this particular weapon. He also examined scrapings from the entrance wound on the body of the deceased for the presence of gunpowder and found none. This witness stated that he performed tests with the .38 caliber pistol, and it deposits powder up to a distance of approximately two to three feet. He expressed an opinion that the muzzle, or the end of the barrel of the weapon, was greater than two or three feet from the blouse when it was fired. The pistols, live rounds, spent cartridges, and a piece of sheetrock cut from the wall in the bathroom were all admitted into evidence without any objections.
On cross-examination this witness testified that the four holes in the blouse were compatible with one bullet and appeared to be in a direct line.
Dr. Henry D. Santina testified that he was a medical doctor employed with the State Department of Toxicology to perform autopsies. His education included five *Page 165 
years of post graduate training in clinical pathology, pathologic anatomy and forensic pathology. He had previously performed autopsies and testified in court as to the cause of death several times in Walker County. His qualifications as an expert were not questioned. He performed an autopsy on the body of Sadie Thomas on April 14, 1979, both externally and internally. He estimated the deceased weighed 100 pounds, saying, "There are no scales in the mortuary." The body was unclothed except for two pairs of underpants.
Dr. Santina stated that there was an entrance wound to the midline of the chest one-sixteenth of an inch to the left of the midline and sixteen inches from the top of the head. The exit wound on the back of the chest was eight inches to the left of the midline and seventeen inches from the top of the head. He did not see any stippling or burning of the skin from gunshot powder, "Hot powder will burn the skin. Cold powder will have no effect." In describing the internal examination and the cause of death, Dr. Santina stated there was a "perforation of the left side of the heart. It was about two inches long in the muscle, but a little less than a half inch as far as the hole shall we say in the heart." He stated that the entrance wound and the exit wound were in a straight line; "There were no intermediary targets that deflected the bullet." He further stated that the cause of death "was a hemorrhage, massive excessive bleeding from the heart that resulted from the gunshot wound that I described." He said the bullet entered at an angle about five degrees from the horizontal plane and forty-five degrees from the middle of the body" five degrees downhill and about forty-five degrees to the left side of the deceased."
Ms. Laura T. Shevlin testified that she was a toxicologist with the Alabama Department of Forensic Sciences at Auburn, Alabama. She received a B.S. in Chemistry from Duke University, M.S. in Physical Chemistry from the University of California, Berkley, and had additional class work in pharmacology and toxicology at Auburn University. She conducted a blood test for ethyl alcohol on blood drawn from the body of the deceased, and the examination was negative. State's Exhibit 32 was introduced into evidence without objection.
The final witness for the State on direct was Bill Ashenfelter, who testified that he was Personnel Manager for the Marshall Durbin Company and knew Sadie Thomas in her lifetime, that she was employed by the Marshall Durbin Company and was supposed to be at work at 5:50 a.m. on the date she was killed.
The State rested its case, and appellant made a lengthy motion to exclude the State's evidence as to all the degrees of homicide embraced in the indictment, separately and severally, setting out numerous grounds. Out of the presence and hearing of the jury, the trial court responded to the motion to exclude the State's evidence as follows:
 "Let me make an observation here as to the statement that Mr. Hewitt gave to the officers which were admitted into evidence over the objection of the defense and with the evidence that has been presented by the State Toxicologist and Dr. McDuffie, there seems to be a direct conflict between the physical evidence and the statements which I admitted of Mr. Hewitt. Quite frankly, we, off the record yesterday, had a discussion at which time I indicated it did not appear to be a very strong case. After hearing Dr. McDuffie and Dr. Santina it appears to be a different ball game so to speak so I am going to deny your motion to exclude the evidence."
Appellant took the witness stand in his behalf. Appellant's counsel has fairly summarized his testimony on both direct and cross-examination, and we quote this summary, but will make some additions and comments.
From the brief:
 "The defense then called defendant John, who testified he was 66 years of age and was to become 67 on November 13, that he lived in Parrish, Alabama, since 1941 and outlined the directions to his house *Page 166 
and to Sadie's house, that he was a former underground miner until he got his back broken and he suffered a stroke in 1975 which paralyzed his left side, that he was taking four kinds of medicine on April 14, 1979, and had accidentally shot himself in the left heel on March 18, 1979, with a .25 caliber gun his son gave him, that his house was broken into in February of 1979 and among other things he lost and later had recovered by the Sheriff the .38 pistol in evidence in this case and he had a permit from the Sheriff of our County to carry both the .38 and .25 pistol, that witness had been retired and unable to work since 1962 and his wife had died in 1963 and he lived alone since then and had become friendly with Sadie about 2 months before her death although he had known her since he had been living in Parrish, Alabama, that Sadie did some cooking for him and they visited each other from time to time and even lived together as husband and wife over a period of time, they got along all right and actually loved each other and there was no ill will between each other, that she helped him with his house cleaning from time to time, and their relationship was good and witness went to the seventh grade in school, has to wear glasses to read small lines, that he called Sadie about 4:00 A.M. the morning of April 13, 1979, and asked her if she had time to clean up a little for him and she agreed to do this, that she did his laundry and she waited on him while he was `on crutches' after accidentally shooting himself and she cooked for him and he loved her and she called him back the morning in question and asked him to come after her and to come and assist her so she could get to his house quicker and he had been on crutches for 3 weeks but did not bring them that morning, that when he arrived at Sadie's house he knocked, told her who he was and she let him in, that witness identified a chair in a picture of Sadie's house (Defendant's Exhibit Number Three) and the picture generally; that the location of the chair in the picture was the same as it was the morning of April 13, 1979, that the chair was a heavy stationary chair and witness identified Defendant's Exhibit Five as the bathroom of the house in question, that the witness also identified the chair in question as the one big chair in the house as is also shown in State's Exhibit Number Fifteen, that when witness knocked on the door he had his pistols with him, one in the bib of his overalls with his pocketbook and his .38 in his side pocket and he was carrying the pistols (he had permits for) because someone had broken into his house and stolen them before, that he had shot one about 13 times in 6 years and the other about a dozen times. That when witness went into the house Sadie chided him for not having his crutches and jokingly threatened to whip him and she asked him to assist her and he went to the kitchen and got some laundry and came back to the chair and sat down as his ankle was bothering him and Sadie was in the kitchen and she came and asked him how much money he had in his pocket and witness answered he had $54.00 and she wanted forty dollars to pay for a new door she had bought as he had given her money from time to time and he told her he would give it to her when he got his next check and she came over to him and said I am going to get it now and he got out of the chair to the left and she was reaching for his pocketbook, that neither of them were mad and he pushed her back twice after her second attempt when she was reaching for the bib of his overalls and she was still not mad and came back the third time and said she was going to get that old gun and he shoved her back as hard as he could, then Sadie came back at him with the intent to get his gun and with her hand up and he grabbed the gun and snatched it back to get it out of her way and he was going to put it behind himself as he had no intention of shooting her and as he struck the chair or the door behind him with the gun it fired and he dropped it and Sadie was about a step and a half to two steps away at that time coming back toward him and she stated *Page 167 
she was shot and witness described the shooting as accidental, that he ran to her and could get no answer and went to the telephone to call her mother and called the operator, but could get no answer and he left his glasses at home and could not read the numbers in the book but he knew Sadie's mother's number from memory and he dialed her phone and told her he dropped a gun and shot Sadie and she said she would be there as soon as she could find C.V. to drive the car, that her mother did not come in 3 or 4 minutes and he went after her, but could not find her, but did find her husband, Robert Nash, and brought him back to Sadie's and her mother had arrived and the Parrish police had arrived thereafter, that he picked up his gun before he left Sadie's house and went looking for help and his intentions at the time of the incident in question were to hold the gun away from Sadie, and he had no intention of getting the gun out when he went there that morning and he testified also as to his height, which is 5 feet 11 inches.
 "On cross-examination he testified he weighed 230 lbs., did not know how much Sadie weighed, but he thought it would be over a 100 pounds, that he knows how to get back home, handles his own business affairs and his money, never been to Bryce's Hospital, had been seeing Sadie for about 7 months and State's Exhibit Number Twenty-five was his pistol he had that morning in his overalls and Sadie was trying to reach for his pistol and he got it out to keep her from getting it while he was standing next to the chair, that Sadie came at him three times and he pushed her away with his left hand twice and she said she was going to get his money and she worked at Marshall Durbin and had to be at work early in the morning and witness testified again that as he pushed Sadie back he took the gun out and pushed it back and he hit something with it and he did not know if his finger was on the trigger when it went off and that he talked with some police officers at the scene, but does not remember if they gave him his rights and witness remembers everything before Sadie was shot, but does not remember anything after she was shot and John was cross-examined about his memory and John had been to see Sadie the night before and neither of them had been drinking and he testified to his signature on a paper, but he did not read it and Sadie was about 2 steps away when this happened or roughly five or six feet away when it went off and shot her and he struck something at that time, but does not know if it was the chair or what.
 "The State offered the signed statement into evidence in the presence of the jury and the Court sustained the defense's objections to the same.
 "On re-direct witness testified about pushing Sadie back and that the purpose of taking the gun out of his pocket and putting it behind him was to keep her from getting ahold of it and not to shoot her as he had no intention to shooting her or even intending to fire the gun, that witness helped pay on Sadie's car payments and prescriptions for medicine for her, had her heater fixed and each was good to the other and he was not expecting any trouble that morning and when asked why he didn't just leave, he stated he did not have time to get out and witness had nothing to drink when he went down there and when he shot himself in the foot he dropped the pistol on the floor and it went off and it was the .25 pistol.
 "It was stipulated by the District Attorney that John's house was broken into and the offenders arrested and prosecuted and through Court in February, 1979.
 "The hospital records from Jasper Community Hospital were introduced without objection which shows a wound to John's heel that went through his left foot on March 18, 1979, along with the records from Jackson Clinic showing treatment therefor and he was `put on crutches', and the records from Brookwood Medical Center from Birmingham, Alabama, were introduced to show John suffered a *Page 168 
stroke or cerebral vascular accident between Thanksgiving and December, 1975, and also the records from St. Vincent Hospital in Birmingham, Alabama, was introduced to show John's injury when he broke his back in the mines in 1953."
Appellant was positive that the chair near the door in the home of the deceased was a "stiff upright chair." It was not a recliner, that it was the only big chair in the living room the morning the deceased was shot, and that the front door could be open without moving or disturbing the chair.
Appellant stated that he had been using crutches for three weeks prior to going to the home of the deceased at 4:00 a.m. on April 13, 1979. The medical records introduced into evidence by the defense contains the following notation:
 "4/10/79: The bullet wound of the left foot has now healed. It is very slightly sore and I told him to dispense with the crutches and start walking on it and keep the foot clean and soak it once a day. If he has any further trouble with the foot to come back to see me.
"B. Nicotri, M.D./jf"
On rebuttal Mr. John Vaughn was recalled as a witness for the State. He was shown State's Exhibit 36 and identified it as a photograph of a chair that he took at 5:45 a.m. on April 13, 1979. He further testified that the chair was "very soft," and that, "It is a reclining chair." He said it was the same chair that appears in several other photographs which he took that same morning that had been admitted into evidence.
Appellant contends reversible error was committed by the trial court in allowing an in-custody statement into evidence when no attorney was present. The evidence adduced by the State reflects that the accused was given the Miranda rights and warnings on two occasions before he was interrogated and at no time did he request the presence of a lawyer. He was also given the pre-Miranda rights and the voluntariness predicate was properly laid on both occasions.
We have many times held that an extrajudicial confession oral or written, is prima facie involuntary and inadmissible, and the duty rests in the first instance on the trial court to determine whether the confession is voluntary, and unless it so appears it should not be admitted. Houston v. State, Ala.Cr.App., 321 So.2d 261; Rainer v. State, Ala.Cr.App.,342 So.2d 1348; Hardin v. State, Ala.Cr.App., 344 So.2d 234.
When the trial court finds on conflicting evidence that a confession or incriminating statement was voluntarily made, such finding will not be disturbed on appeal unless it appears contrary to the great weight of the evidence or is manifestly wrong. Sparks v. State, Ala.Cr.App., 376 So.2d 834; Burks v.State, Ala.Cr.App., 353 So.2d 539; Patterson v. State, Ala.Cr.App., 321 So.2d 698; Balentine v. State, Ala.Cr.App.,339 So.2d 1063, cert. denied, 339 So.2d 1070.
Appellant lays great emphasis on the fact that when he made a statement to Officers Vaughn and Guthrie he was sixty-six years of age, in bad health, taking four different kinds of medication for high blood pressure and other ailments, had suffered a stroke in 1975, which paralyzed his left side for a while, and could not read fine print without his glasses, and in this condition he could not make an intelligent waiver of his constitutional rights.
In Elrod v. State, 281 Ala. 331, 202 So.2d 539, the Supreme Court held:
 "An `illiterate' is one ignorant of letters and books, unlettered, uninstructed, uneducated, unable to read or write, uncultivated, without book learning. [Citation omitted] While illiteracy is a great misfortune, it does not mean insanity, and does not constitute a defense to crime or render a confession of guilt, otherwise unobjectionable, inadmissible in evidence against him. [Citation omitted] Accused's intelligence, character and situation at the time of the confession of the crime charged are important considerations in determining whether the confession was voluntary, but the fact that accused was of tender age or weak intellect *Page 169 
will not alone render the confession inadmissible in evidence as involuntary. [Citation omitted] Evidence tending to show a defendant's weak mentality, feeblemindedness, and mental stress does not affect the admissibility of the confessions, but rather is a matter that bears on the weight, credibility and effect to be given the confessions by the jury. [Citation omitted]."
Appellant claims the confessions were involuntary, but points to no threats, force, violence, rewards, or promises, nor any of the things that have been held to render confessions involuntary. He also claims that it was not shown that he intelligently and voluntarily waived his rights.
These claims are not supported by the record. The record reflects that two complete Miranda rights and warnings were given to appellant and that appellant acknowledged understanding them and stated his willingness to talk to the officers. He made the statement to both officers that the shooting was an accident.
The scientific evidence cast a serious doubt on appellant's claim that the killing was accidental. According to the testimony of both Dr. McDuffie and Dr. Santina, the blouse which the deceased was wearing at the time she was shot showed no powder residue, and there were no powder burns on the body where the bullet entered the chest of the deceased. Dr. McDuffie determined that the death weapon would produce powder burns and deposits for a distance of two to three feet from the barrel of the pistol, and in his opinion the weapon had to be at least two or three feet from the deceased when it was fired. Appellant stated that the deceased was five to six feet away from him when the pistol was accidentally discharged.
Conflicting testimony is for the jury to resolve, and a verdict rendered thereon will not be disturbed on appeal. Woodsv. State, Ala.Cr.App., 344 So.2d 1225; Young v. State, Ala.Cr.App., 346 So.2d 509.
Appellant contends that the trial court erred to a reversal in its oral charge to the jury. The short answer to this contention is that no exceptions were reserved to the oral charge. In this state of the record nothing is presented for review. In this state of the record nothing is presented for review. In the absence of an exception to the oral charge, the claimed error cannot be raised for the first time on appeal. Nor can it be raised in a motion for a new trial. Davidson v.State, Ala.Cr.App., 360 So.2d 728, and cases therein cited, cert. denied, Ala., 360 So.2d 731; Cox v. State, 280 Ala. 318,193 So.2d 759. Not only must the exception be reserved to the oral charge to invite a review, but it must be done before the jury retires to deliberate on the verdict. Cox v. State, supra.
Appellant requested numerous written charges. Some of these charges were given, others were not. Most of those refused were affirmative in nature or were confusing, argumentative and misleading. Most refused charges, stating correct principles of law, were covered in the oral charge or other given charges. In brief, appellant argues only the refusal of Charges 7, 11, 32, 49, and 50.
Requested Charge No. 7 was fully covered in the court's oral charge to the jury.
Charges 11 and 32 directed the jury to find the defendant not guilty if they had a reasonable doubt of his guilt "as charged in the indictment [Number 11]," or if they had a reasonable doubt as to "any material allegation in the indictment [Number 32]." These charges were properly refused as they totally ignored the possibility of appellant being convicted of a lesser included offense embraced in the indictment charging murder in the first degree. As we have pointed out, appellant was convicted of manslaughter in the first degree. See Franklinv. State, 145 Ala. 669, 39 So. 979; Williams v. State, 161 Ala. 52,50 So. 59, and Section 15-17-1, Code of 1975.
Refused Charges 49 and 50 were based on the fact that the evidence showed without dispute that appellant had a lawful permit to carry the death weapon. A pistol permit does not enlarge a person's legal *Page 170 
rights except to carry a pistol concealed on his person. A pistol permit does not confer on the permittee the right to do an unlawful act. Williams v. State, supra. The trial court properly refused these charges.
Decision on a motion for a new trial rests largely within the sound discretion of the trial court, and in reviewing such decision the Court of Criminal Appeals will indulge every presumption in favor of the correctness thereof. Parks v.State, Ala.Cr.App., 333 So.2d 906, cert. denied, Ala.,333 So.2d 912; Hawkins v. State, Ala.Cr.App., 333 So.2d 846, cert. denied, Ala., 333 So.2d 851; Cooper v. State, Ala.Cr.App.,331 So.2d 752, cert. denied, Ala., 331 So.2d 759.
We have not overlooked the fact that, after the jury had deliberated for a period of time, they return to the courtroom and asked the judge who fixed the punishment, the judge or the jury, and the court said, "The jury." Whereupon, the foreman turned to another juror and conferred with him for a few seconds. The foreman then wrote in the number "4" on the verdict form of manslaughter in the first degree and passed the verdict to the trial judge. Appellant made no objections to this procedure.
While we do not think this constituted reversible error, we believe the proper procedure would have been for the court to send the jury back to the jury room with instructions to prepare the verdict and let the bailiff know they were ready to report to the court. The very least the court should have done was to ex mero motu poll the jury in the presence of appellant and his counsel in open court.
We cannot hold that the trial court abused its discretion in denying the motion for a new trial. Its decision was not wrong and unjust.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none. The judgment of conviction is due to be
AFFIRMED.
All the Judges concur.